Exhibit "A"
## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of this 1st day of July, 2011 (the "Execution Date"), by and among Teters Floral Products, Inc., a Delaware corporation ("Purchaser"), and Napa Home and Garden, Inc., a California corporation ("Seller").

WHEREAS, Purchaser desires to purchase, and Seller desires to sell, convey, assign, transfer and deliver to Purchaser, certain assets relating to the business conducted by the Seller (the "Business"); and

NOW, THEREFORE, in consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS AND RULES OF CONSTRUCTION

**1.1**    **Definitions**.  Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Accounts Receivable" means any trade accounts receivable and other rights to payment owed to the Seller as of the Closing, together with the full benefit of any security interest of the Seller therein and any claim, remedy or other right related to the foregoing;

"Acquired Assets" means all of the direct and indirect right, title and interest of Seller in and to the following assets:

    (a) all of Seller's rights under the Assumed Contracts (including deposits thereunder);

    (b) all of Seller's Intellectual Property;

    (c) all Equipment;

    (d) all Accounts Receivable;

    (e) all prepaid expenses incurred or paid by the Seller prior to the Closing other than any prepaid expenses related to the Seller's insurance policies and prepaid Taxes;

    (f) all Inventory, other than Excluded Inventory, as of the Closing (the "Acquired Inventory");

    (g) all Universal Product Codes with respect to Acquired Inventory;

    (h) all books and records (other than the Excluded Books and Records), including customer and supplier lists and related customer and supplier information;

    (i) all rights, recoveries, refunds, counterclaims, rights to offset, choses in actions, rights under all warranties, representations and guarantees made by suppliers of

products, materials or equipment or components thereof, other rights and claims (whether known or unknown, matured or unmatured, contingent or accrued) against third parties resulting from, arising out of or otherwise with respect to any of the Acquired Assets or Assumed Obligations; and

(j) all other intangible rights and properties, including goodwill of the Seller as a going concern and all e-mail, website, Internet, facsimile and telephone numbers used by the Seller.

"Acquired Inventory" shall have the meaning set forth in the definition of Acquire Assets.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Agreement" means this Asset Purchase Agreement, including all the Exhibits and the Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"Allocation" shall have the meaning set forth in Section 10.4(b) hereof.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 3.2(a) hereof.

"Assumed Contracts" means collectively those Contracts of Seller set forth on Schedule 1.1(a) under the heading "Assumed Contracts," which schedule may be amended by Purchaser from time to time through and including the Closing Date; *provided* that Seller and Purchaser agree that the term Assumed Contracts shall not include the Las Vegas Showroom Lease and shall at all times include the Closed End Vehicle Lease Agreement, dated as of January 26, 2011, between Napa Home and Garden Inc. and Gwinnett Place Honda.

"Assumed Obligations" means only: the obligations arising under the Assumed Contracts, (other than obligations resulting from Seller's default occurring prior to the Closing), as well as accounts payable owed by the Seller to its trade vendors in relation to the Acquired Inventory based upon Seller's landed cost (i.e. purchase price, freight and delivery charges) incurred in the ordinary course of business after the Petition Date (provided that such accounts payable will only constitute Assumed Obligations (i) as payment obligations to be paid over the course of six months in six equal monthly installments (the first of which shall be due no later than thirty days after the Closing Date) and (ii) if the applicable trade vendor agrees in writing to provide (A) the six-month payment terms described in (i) above and (B) the Purchaser with trade and payment terms on future purchases that are no less favorable than the most favorable terms provided by such trade vendor to the Seller after the Petition Date and prior to the Closing Date).

"Auction" means the auction conducted by Seller pursuant to the Bidding Procedures Order and Section 6.5 hereof.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Georgia.

"Bidding Increment" shall have the meaning set forth in Section 6.5(d) hereof.

"Bidding Procedures" means the procedures outlined in the Bidding Procedures Order.

"Bidding Procedures Order" means an order entered by the Bankruptcy Court in a form satisfactory to Purchaser, approving, among other things, the Bidding Procedures, the Breakup Fee and Expense Reimbursement.

"Bill of Sale" shall have the meaning set forth in Section 3.2 hereof.

"Breakup Fee and Expense Reimbursement" shall have the meaning set forth in Section 9.2(a) hereof.

"Business" shall have the meaning set forth in the Preamble.

"Business Day" means a day other than Saturday, Sunday or other day that banks located in New York, New York or Atlanta, Georgia are authorized or required by Law to close.

"Chapter 11 Case" means the case(s) to be commenced by Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Claim" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at Law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" shall have the meaning set forth in Section 3.1 hereof.

"Closing Date" shall have the meaning set forth in Section 3.1 hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contract" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral.

"Contract Rejection Date" shall have the meaning set forth in Section 2.6.

"Cure Payments" means any cure payment or obligations (pursuant to section 363 or 365 of the Bankruptcy Code) due by Seller, and required by the Bankruptcy Court to be made or assumed by Purchaser, in order to cure any default with respect to any Acquired Assets or Assumed Obligations.

"Deposit" shall have the meaning set forth in Section 2.4 hereof.

"Dollars" or "$" means dollars of the United States of America.

3

"Eligible Employees" shall have the meaning set forth in Section 10.1(a) hereof.

"Equipment" means machinery, fixtures, furniture, supplies, accessories, materials, equipment, parts, automobiles, trucks, vehicles, office equipment, computers, servers, telephones, and all other items of tangible personal property that are owned or leased (to the extent the applicable lease is an Assumed Contract) by Seller.

"ERISA" means The Employee Retirement Income Security Act of 1974 (ERISA), as may be amended from time to time.

"Escrow Agent" shall have the meaning set forth in Section 2.4 hereof.

"Escrow Agreement" shall have the meaning set forth in Section 2.4 hereof.

"Excluded Books and Records" means all corporate seals, organizational documents, stock record books, corporate record books containing minutes of meetings of directors and shareholders, Tax Returns and all other records having to do with the organization or capitalization of Seller, as well as employee personnel records.

"Excluded Inventory" means Inventory with SKU's and product descriptions set forth on Schedule 1.1(c) attached hereto.

"Execution Date" shall have the meaning set forth in the Preamble hereto.

"Exhibits" means the exhibits hereto.

"Final Order" means an Order which has not been stayed or vacated and as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Intellectual Property" means all (i) patents, patent applications, registrations, patent disclosures and all related continuations, continuations-in-part, divisions, reissues, and reexaminations, utility models, certificates of invention and design patents, and all improvements thereon and extensions thereof, (ii) trademarks, service marks, trade dress, logos, slogans, corporate names, trade names, domain names, and other designations of source, origin, sponsorship, endorsement or certification, together with the goodwill associated with any of the foregoing, and all applications and registrations therefore, (iii) copyrights and registrations and applications therefore, together with all translations, adaptations, derivations and combinations therefore, works of authorship, publications, website content, and moral rights (iv) confidential and proprietary information, including, without limitation, trade secrets, concepts, ideas, research and development, financial, marketing and business data, pricing and cost information, business and marketing plans, algorithms, know-how, formulae, inventions (whether or not patentable), processes, techniques, technical data, designs, drawings, specifications, databases, and customer and supplier lists and information, (v) computer programs, software, including any and all

4

software implementations of algorithms, hardware, models and methodologies, whether in source code or object code, operating systems, design documents, website code, operating systems and specifications, flow-charts, user manuals and training materials relating thereto and any translations thereof, (vi) other proprietary or contract rights or rights of publicity relating to any of the foregoing (including remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions), and (vii) copies and tangible embodiments of any and all of the foregoing.

"Inventory" means all finished goods inventory, goods-in-transit, raw materials and work-in-process and packaging materials.

"IP Assignments" shall have the meaning set forth in Section 3.2(d).

"Knowledge of Seller" shall mean the actual knowledge of Jerry Cunningham,  KC Cunningham, and Crystal Roberts, together with such knowledge that such persons would reasonably be expected to discover after reasonably due inquiry of the matter in question.

"Law" means any law, statute, regulation, ruling, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Las Vegas Showroom Lease" means the lease agreement by and between WMCV Phase 3, LLC, as landlord, and Seller, as tenant, dated as of April 18, 2007, as amended by that certain First Amendment to Lease dated as of June 30, 2008, as further amended by that certain Second Amendment to Lease Agreement dated August 19, 2009, as further amended by that certain Third Amendment to Lease Agreement dated June 1, 2011 for the space identified as space no. C-718 on th 7th floor of the building located at 455 Grand Central Parkway, Las Vegas, Nevada.

"Leaf Finance Agreement" means the Progress Payment Agreement by and between Seller and Leaf Financial Corporation dated July 29, 2009 for the purchase of the Trade Show Booth.

"Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including, without limitation, any liability for Taxes.

"Lien" or "Liens" means any charge, claim, lien, option, encumbrance, mortgage, pledge, security interest, conditional sale agreement or other title retention agreement, lease, security agreement, right of first refusal, option, restriction, tenancy, license, covenant, right of way, easement or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or statute or Law of any jurisdiction) on property.

"Material Adverse Effect" means any change or event that has had or would reasonably be likely to have a material adverse effect on the assets, liabilities, operations or condition (financial or otherwise) of Seller or the Business excluding recalls or liability related to the Excluded Inventory, the Chapter 11 filing or cancelation of liability insurance.

5

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses possessed by Seller, or through which Seller has rights, that are used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"Petition Date" shall have the meaning set forth in Section 6.4 hereof.

"Purchase Price" shall have the meaning set forth in Section 2.3.

"Purchaser" shall have the meaning set forth in the Preamble.

"Purchaser Default Termination" shall have the meaning set forth in Section 2.4 hereof.

"Qualified Bids" shall have the meaning set forth in Section 6.5(e) hereof.

"Rehired Employees" shall have the meaning set forth in Section 10.1(a) hereof.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Order" means an order entered by the Bankruptcy Court in a form satisfactory to Purchaser, authorizing Seller to sell the Acquired Assets to Purchaser pursuant to this Agreement and sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all Liens, claims and interests other than the Assumed Obligations.

"Schedules" means the schedules attached hereto.

"Seller" shall have the meaning set forth in the Preamble hereto.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person all federal, state, local, county, foreign and other taxes, charges, fees, duties, customs, levies and other assessments, including, without limitation, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), abandoned property, escheat, environmental or windfall profit tax, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

6

"Trade Show Booth" means the trade booth purchased pursuant to the Leaf Finance Agreement.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"Warehouse Lease" means that Multi-Tenant Industrial Net Lease by and between Cabot Industrial Venture A, LLC, as original landlord and Seller, as tenant, dated August 2, 2004, as modified pursuant to that certain First Amendment to Lease dated July 29, 2009 and naming Cobalt Industrial Reit II, as landlord, for suite 240 at 3270 Summit Ridge Parkway, Duluth, Georgia.

"WARN Act" means the Worker Adjustment and Retraining Notification Act and any rules or regulations as have been issued in connection therewith.

**1.2    Rules of Construction**.  Unless the context otherwise clearly indicates, in this Agreement, (a) the singular includes the plural, (b) "includes" and "including" are not limiting, (c) "may not" is prohibitive and not permissive; and (d) "or" is not exclusive.

## ARTICLE 2

## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

**2.1    Purchase and Sale of Acquired Assets**.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery of, for the consideration specified in Section 2.3, all of the Acquired Assets, free and clear of all Liens (provided and except that the Trade Show Booth may be subject to a lien related to the Leaf Finance Agreement).

**2.2    Assignment and Assumption of Assumed Obligations**.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Purchaser shall assume from Seller, and thereafter be solely responsible for the payment, performance or discharge, of only the Assumed Obligations.  Purchaser will not assume or have any responsibility, however, with respect to any other Liability not included within the definition of Assumed Obligations, including any Liabilities related to (a) Taxes, (b) the employment (or the termination of employment) of any employees of Seller, (c) claims of any vendor of Seller, (d) any Liability related to Excluded Inventory or (d) the operation of the Business or the Acquired Assets prior to the Closing.

**2.3    Purchase Price**.

(a)    The aggregate purchase price for the Acquired Assets payable at the Closing shall be (i) an amount in cash equal to $1,100,000 (the "Purchase Price") (subject to adjustment in accordance with Section 2.3(b)), less (ii) the Deposit, plus (iii) the assumption of the Assumed Obligations.  Payments made pursuant to this Section 2.3 shall be allocated among

the assets purchased in accordance with <u>Section 10.4(b)</u>.

(b) On the Business Day prior to the Closing, Seller and Purchaser shall conduct a joint physical inventory of the Acquired Inventory.  If the value of the Acquired Inventory (using the actual cost value) as determined by the physical inventory exceeds $1,000,000, the Purchase Price payable at the Closing shall be increased by an amount equal to such excess.  If the value of the Acquired Inventory (using the actual cost value) as determined by the physical inventory is less than $1,000,000, the Purchase Price payable at the Closing shall be decreased by an amount equal to such deficiency.

2.4 **<u>Deposit</u>**.  On the Execution Date, Seller and Purchaser shall enter into an escrow agreement, on terms reasonably acceptable to Seller and Purchaser (the "<u>Escrow Agreement</u>"), with Jones & Walden, LLC (the "<u>Escrow Agent</u>"), and Purchaser shall deposit into escrow with the Escrow Agent an amount equal to one hundred thousand dollars ($100,000) (such amount, together with any interest accrued thereon prior to the Closing Date, the "<u>Deposit</u>").  The Deposit shall become payable to Seller upon the earlier of (a) the Closing, (b) the proper termination of this Agreement by Seller pursuant to Section 9.1(c) (a "<u>Purchaser Default Termination</u>").  The Deposit shall become payable to Purchaser upon the termination of this Agreement other than pursuant to a Purchaser Default Termination.  If the Deposit becomes payable to Seller by reason of a Purchaser Default Termination, the Escrow Agent shall, within ten (10) Business Days after receiving notice of such Purchaser Default Termination from Seller (which notice Seller shall simultaneously deliver to Purchaser), disburse the deposit to an account designated by Seller; <u>provided</u>, <u>however</u>, that no funds shall be disbursed if Purchaser delivers a written objection to the Purchaser Default Termination.  If the Deposit becomes payable to Purchaser, the Escrow Agent shall, within ten (10) Business Days after receiving notice thereof from Purchaser (which notice Purchaser shall simultaneously deliver to Seller), disburse the deposit to an account designated by Purchaser.

2.5 **<u>Obligations in Respect of Assumed Contracts</u>**.  To the extent that any Assumed Contract is subject to a cure amount pursuant to sections 363 or 365 of the Bankruptcy Code or otherwise, immediately after the Closing, Seller shall directly pay or otherwise provide for the amount of any applicable Cure Payment.

2.6 **<u>Post-Closing Use and Assignment of Contracts</u>**.

(a) With respect to any Contract that is not an Assumed Contract as of the Closing Date, and provided that such Contract is still in effect and has not been rejected by Seller pursuant to section 365 of the Bankruptcy Code, upon written notice(s) from Purchaser within 45 days following the Closing Date, as soon as practicable, Seller shall take all actions reasonably necessary to assume and assign to Purchaser pursuant to section 365 of the Bankruptcy Code any Contract(s) set forth in Purchaser's notice(s); provided, that any applicable Cure Payment shall be satisfied by Purchaser.  Notwithstanding the foregoing, following the Closing, Seller shall be authorized to reject any Contract not subject to such notice by Purchaser and shall provide the Purchaser with notice of any such Contract rejection within 2 Business Days thereof.  Notwithstanding anything to the contrary herein, Seller shall be authorized to reject the Las Vegas Showroom Lease at anytime on or after the Petition Date at Seller's sole option and shall provide the Purchaser with notice of any such Contract rejection within 2 Business Days thereof.

In the event Purchaser provides written notice to Seller that it does not intend to assume a Contract prior to the Closing Date, Seller shall be authorized to reject such Contract following receipt of such notice and shall provide the Purchaser with notice of any such Contract rejection within 2 Business Days thereof.

(b)     In the event the Warehouse Lease is an Assumed Contract, the Seller shall be permitted to store the Excluded Inventory (which is located on the premises as of the Closing Date) on the premises for 60 days following the Closing Date at no charge (provided that access to and relocating such Excluded Inventory shall be at reasonable business hours of the Purchaser, shall not interfere with the Purchaser's operations and shall be at Seller's cost).

## ARTICLE 3

## CLOSING

**3.1     Closing**.   Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "Closing") will take place at the offices of Seller's counsel (or such other location as agreed to by the parties in writing), prevailing local time, no later than the first Business Day after the date on which the conditions set forth in ARTICLE 7 and ARTICLE 8 have been satisfied or waived; or on such other date or place as Purchaser and Seller may determine (the "Closing Date").

**3.2     Deliveries by Seller**.   At the Closing, Seller shall deliver or procure delivery to Purchaser of:

(a)     one or more assignments and assumptions of the Assumed Obligations, in form and substance satisfactory to the Purchaser (collectively, the "Assignment and Assumption Agreement"), duly executed by Seller;

(b)     duly executed statutory and regulatory consents and approvals which are required under the laws or regulations of the United States and other Governmental Authorities, and all other necessary consents and approvals of third parties or Affiliates of Seller to the transactions contemplated hereby;

(c)     a bill of sale with respect to the Acquired Assets, in form and substance satisfactory to Purchaser (the "Bill of Sale"), duly executed by Seller;

(d)     Intellectual Property assignments, in form and substance satisfactory to Purchaser (the "IP Assignments"), duly executed by Seller;

(e)     evidence in form and substance satisfactory to Purchaser of the release of all Liens with respect to the Acquired Assets;

(f)     a certified copy of each of the Bidding Procedures Order and the Sale Order;

(g)     all other agreements, records and other documents required by this Agreement; and

9

(h)    all such other instruments of conveyance and related affidavits as shall, in the reasonable opinion of Purchaser, be necessary to vest in Purchaser good, valid and marketable title to the Acquired Assets, including time-stamped instruments and releases, in form and substance satisfactory to Purchaser, evidencing release and removal of any Liens on the Acquired Assets.

**3.3    Deliveries by Purchaser**.  At the Closing, Purchaser shall deliver or procure delivery to Seller of (a) the Purchase Price (as adjusted), less the Deposit and (b) the Assignment and Assumption Agreement, duly executed by Purchaser.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as of the Execution Date and as of the Closing Date as follows:

**4.1    Organization and Standing**.  Seller is duly incorporated or organized, as applicable, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and, except where the failure to obtain such qualification could not reasonably be expected to have a Material Adverse Effect, is qualified or licensed to do business in each jurisdiction in which the properties owned, leased or operated by Seller makes such qualification necessary.  Seller has all Permits necessary to own and operate its properties and to carry on the Business as now conducted by it, except such Permits the failure of which to have would not be reasonably expected to have a Material Adverse Effect.

**4.2    Authorization and Power**.  Subject to any necessary authorization from the Bankruptcy Court, Seller has all requisite power and authority to own, lease and operate its real properties, to carry on the Business as now being conducted and to execute and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder.  All Transaction Documents to which Seller is a party have been duly executed and delivered by Seller, except such Transaction Documents that are required by the terms hereof to be executed and delivered after the date hereof, in which case such Transaction Documents will be duly executed and delivered at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents to which Seller is a party constitute, or will constitute, as the case may be, the valid and binding agreements of Seller, enforceable against Seller in accordance with their terms.

**4.3    Title to Assets**.  Seller has good, valid, marketable and undivided title to, or a valid leasehold interest in, the Acquired Assets free and clear of all Claims and Liens.  Subject to Bankruptcy Court approval, Seller has the power and the right to sell, assign and transfer, and Seller will sell and deliver to Purchaser, and Purchaser will be vested with good, valid, marketable and undivided title to, the Acquired Assets, free and clear of all Claims and Liens. The tangible Acquired Assets are in good operating condition, working order and repair, subject to ordinary wear and tear, free from defects (other than immaterial defects), and have been maintained in accordance with normal industry practice.  Schedule 4.3 attached hereto lists all Contracts pursuant to which Seller leases tangible assets, including the Equipment.

10

4.4    **Conflicts; Consents**.

(a)    The execution, delivery and performance by Seller of this Agreement and the consummation of the transaction contemplated hereby, and compliance by Seller with any of the provisions hereof do not, or will not at the time of execution, result in the creation of any Lien upon the Acquired Assets and do not, or will not at the time of execution, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provisions of: (i) such Seller's certificate of incorporation, bylaws or comparable organizational documents; (ii) subject to entry of the Sale Order, any Assumed Contract to which such Seller is a party or by which any of the Acquired Assets are bound; (iii) subject to entry of the Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to such Seller or any of the Permits, licenses, rights, properties or assets of such Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law.

(b)    Subject to entry of the Sale Order, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is or will become a party, the compliance by such Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets.

4.5    **Assumed Contracts**.    Schedule 1.1(a) attached hereto contains a list of all Assumed Contracts.  Except for defaults that will be cured through the Cure Payments listed on Schedule 4.6 attached hereto or defaults arising solely as a consequence of the commencement of the Chapter 11 Case, neither Seller nor, to the Knowledge of Seller, any other party thereto is in default or breach in any material respect under the terms of any Assumed Contract.

4.6    **Cure Amounts**.  Schedule 4.6 attached hereto sets forth all of the Cure Payments to be satisfied for purposes of Seller's assumption and assignment to Purchaser of the Assumed Contracts under section 365 of the Bankruptcy Code.  In the event Purchaser notifies Seller that it intends to add a Contract to Schedule 1.1(a) prior to the Closing Date, Seller shall, within two days of such notice, update Schedule 4.6 to include the applicable Assumed Contracts.

4.7    **Acquired Inventory**.    All Acquired Inventory is of a quality, quantity and condition useable and saleable in the ordinary course of business consistent with past practice.  The location of all Acquired Inventory as of the Business Day prior to the date hereof is set forth on Schedule 4.7.  None of the Acquired Inventory consist of items held on consignment, is obsolete, damaged, defective or discontinued.  Seller has not received any payment with respect to products that have not been shipped as of the Closing Date.

4.8    **Intellectual Property**.  Schedule 4.8(a) attached hereto sets forth all registered and unregistered Intellectual Property (including registration applications) that Seller owns or otherwise has the right to use in the operation of the Business as presently conducted (the "Business Intellectual Property Rights").  To the Seller's Knowledge, none of the activities or business presently conducted by the Seller infringes or violates, or constitutes a misappropriation

11

of, any Intellectual Property rights of any Person.  The Business Intellectual Property Rights are not subject to any restrictions or limitations regarding use or disclosure other than pursuant to a written license agreement set forth on <u>Schedule 4.8(b)</u> attached hereto.  Since December 31, 2010, Seller has not received any notification from any third party alleging that Seller infringes any Intellectual Property of such third party.  To the Knowledge of Seller, no third party is infringing, misappropriating or otherwise conflicting with any of the Business Intellectual Property.

**4.9    Real Property**.  The Seller does not hold any fee or other ownership interest in any real property.  The only leasehold interests in real property held by Seller are listed on <u>Schedule 4.9</u> attached hereto (the "<u>Real Property Leases</u>").  A true, complete and correct copy of the Real Property Leases have been delivered or made available to Purchaser.  Except for the Real Property Leases, Seller does not occupy, is not legally obligated for, has no interest in, or have any rights or obligations to acquire such interests (including, but not limited to, any options or rights of first refusal to purchase or lease).

**4.10    Insurance**.  <u>Schedule 4.10</u> attached hereto sets forth (a) a list of each insurance policy and fidelity bond which covers the Seller, the Business or the Acquired Assets (the "<u>Policies</u>") and (b) a list of all pending claims and the claims history for Seller during the current year and the preceding two years (including with respect to insurance obtained but not currently maintained).  There are no pending claims under any of such Policies as to which coverage has been questioned, denied or disputed by the insurer or in respect of which the insurer has reserved its rights.  The Policies are sufficient for compliance with all Laws and Contracts to which Seller is a party or by which it is bound in connection with the Business (other than with respect to the Excluded Inventory).  Except as set forth on Schedule 4.10(c), Seller has not received a notice of cancellation of any Policy or of any material changes that are required in the conduct of the Business as a condition to the continuation of coverage under, or renewal of, any such Policy.  Seller does not have any self-insurance arrangements.

**4.11    Customers**.  <u>Schedule 4.11(a)</u> attached hereto sets forth a complete and accurate of the ten (1) largest customers of the Business based on net sales during the year ended December 31, 2010 and for the three month period ended March 31, 2011 (the "<u>Key Customers</u>").  Except as set forth in <u>Schedule 4.11(b)</u> attached hereto, no Key Customer has cancelled, terminated, or otherwise materially and adversely modified its relationship with the Business and, to the Knowledge of the Seller, no Key Customer intends to cancel, terminate or otherwise materially and adversely modify its relationship with the Business, either as a result of the consummation of the transactions contemplated by this Agreement or otherwise.  Since December 31, 2010, Seller has not sold or provided any amount of products (a) with payment terms longer than terms it customarily offers for such product, (b) at a discount from the listed price materially differing from any discounts it customarily offers for such product, or (c) with shipment, return or similar terms materially differing from the shipment, return or similar terms it customarily offers for such products.

**4.12    Affiliate Transactions**.  Except as set forth in <u>Schedule 4.12</u> attached hereto, (a) there are no Contracts, understandings or proposed transactions, between Seller or any of its Affiliates on the one hand and Seller any other of its Affiliates on the other hand that relate to the Business or the Acquired Assets and (b) there are no services provided to the Business by Seller

or any of its Affiliates that will be necessary in order to continue operation of the Business after the Closing as it is presently conducted.

**4.13**    **Contracts**.

(a)    Schedule 4.13(a) attached hereto sets forth a list of all Contracts (other than the Real Property Leases) to which the Seller is a party or which otherwise relate to the Business or bind the Acquired Assets.  The Contracts required to be listed on Schedule 4.13 which are material to the Business and the Real Property Leases are collectively referred to as the "Material Contracts."  Seller has delivered true, complete and correct copies of each Contract required to be listed on Schedule 4.13(a).

(b)    Except as set forth on Schedule 4.13(b), (i) each Material Contract is in full force and effect and is valid, binding and enforceable in all material respects in accordance with its terms, (ii) the Seller has complied with and is in compliance with, and to the Knowledge of Seller, all other parties thereto have complied with and are in compliance with, the provisions of each Material Contract in all material respects, (iii) Seller is not, and to Knowledge of Seller, no other party thereto is, in default in the performance, observance or fulfillment of any obligation, covenant, condition or other term contained in any Material Contract, and Seller has not given or received notice to or from any Person relating to any such alleged or potential default that has not been cured and (iv) except for the Chapter 11 filing, and recalls or liability related to the Excluded Inventory, no event has occurred which with or without the giving of notice or lapse of time, or both, has resulted in or is reasonably likely to result in a violation or breach of, or give any Person the right to exercise any remedy under or accelerate the maturity or performance of, or cancel, terminate or modify, any Material Contract.

**4.14**    **Taxes**.  Except as set forth on Schedule 4.14 attached hereto:

(a)    Seller has filed all Tax Returns that it was required to file. All such Tax Returns were correct and complete in all material respects. All Taxes owed by Seller (whether or not shown on any Tax Return) have been paid.  Seller is not the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made by a Governmental Authority in a jurisdiction where such Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction.

(b)    Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 (or any other applicable form) required with respect thereto have been properly completed and timely filed.

(c)    There is no dispute or claim concerning any Tax Liability of Seller claimed or raised by any authority in writing or, to the Knowledge of Seller, orally.  Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d)    Seller is and has always been an S Corporation, within the meaning of section 1361 of the Code, for federal and applicable state and local income Taxes purposes.

13

4.15    **Labor Matters**.

(a)    Seller is not a party to any collective bargaining agreement or has any relationship with any labor organization.  There is no labor strike, slowdown, work stoppage or other material labor dispute relating to Seller pending or, to the Knowledge of Seller, threatened against Seller.  No union organizing or decertification efforts are underway or, to the Knowledge of Seller, threatened, and no other question concerning representation exists.

(b)    Seller has not received notice of any material employment-related charge or material complaint against Seller before the Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board or any other Governmental Authority and Seller has not received any notice of any material threatened employment-related charge or complaint against Seller any such Governmental Authority.

(c)    With respect to this transaction, any notice required under any Law has been given, and all bargaining obligations with any employee representative have been, or will be (prior to the Closing), satisfied.  Seller has not implemented any mass layoff of employees that could implicate the WARN Act or similar state, local or foreign Laws or regulations.

4.16    **Litigation; Proceedings**.    Other than as set forth on <u>Schedule 4.16</u> attached hereto, there is no claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to the Knowledge of Seller, threatened against or related to the Business, whether at Law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to the Knowledge of Seller, threatened by or before any arbitrator or any Governmental Authority. None of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any settlement agreement with any Person.

4.17    **Compliance with Laws**.    Seller (a) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws in all material respects (except as to (i) the United States Consumer Products Safety Commission proceedings; (ii) Health Canada proceedings; (iii) the State of Connecticut requests related thereto, in each case of clauses (i), (ii) and (iii) relating solely to the Excluded Inventory), and (b) holds all Permits, concessions, grants, licenses, easements, variances, exemptions, consents, orders, franchises, authorizations and approvals of all Governmental Authorities necessary for the lawful conduct of the Business and is in compliance with all of the foregoing in all material respects.  Since December 31, 2009, Seller has not received any written notice or other written communication from any Governmental Authority or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Permit (other than related to Excluded Inventory) or (ii) notifying a Seller of the non-renewal, revocation or withdrawal of any Permit.  Seller is in compliance with the terms of the Permits.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as of the Execution Date and as of the Closing Date as follows:

**5.1    Organization, Standing and Power**.  Purchaser is a Delaware corporation duly incorporated, validly existing and in good standing under the Laws of the state of its incorporation.

**5.2    Authorization**.  Purchaser has all requisite power and authority to own, lease and operate its properties, and to execute and deliver the Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.  All Transaction Documents to which Purchaser is a party have been duly executed and delivered by Purchaser, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Purchaser after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Purchaser at or prior to the Closing, and all Transaction Documents to which Purchaser is a party constitute, or will constitute, as the case may be, the valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

**5.3    No Conflict or Violation**.  Except to the extent any of the foregoing is not enforceable due to operation of applicable bankruptcy Law or the Sale Order, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Purchaser do not and shall not violate any Law or any provision of the charter or organizational documents of Purchaser.

**5.4    Availability of Funds**.  At the Closing, Purchaser will have cash available which is sufficient to enable it to consummate the transactions contemplated by this Agreement.

## ARTICLE 6

## COVENANTS OF PURCHASER AND SELLER; OTHER AGREEMENTS

**6.1    Consents and Approvals**.  Seller shall use commercially reasonable efforts (a) to obtain all necessary consents and approvals to consummate the purchase and sale of the Acquired Assets and the assignment of the Assumed Obligations, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including, without limitation, obtaining the Bidding Procedures Order and Sale Order, (b) to make all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Seller or any of their Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby and (c) to obtain all required consents and approvals (if any) necessary to assign and transfer Seller's Permits included in the Acquired Assets to Purchaser at Closing.  In the event that certain of Seller's Permits included in the Acquired Assets are not transferable or replacements therefor are

15

not obtainable on or before the Closing, but such Permits are transferable or replacements therefor are obtainable after the Closing, Seller and Purchaser shall continue to cooperate and use such commercially reasonable efforts after the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for, such Permits after Closing and shall do all things necessary to give Purchaser the benefits that would be obtained under such Permits.  Each of the parties shall give any other notices to, make any other filings with, and use reasonable best efforts to obtain, any other authorizations, consents and approvals of any other Governmental Authority in connection with the matters contemplated by this Agreement.

**6.2** **Access**.  Seller shall, prior to the Closing Date, (a) provide Purchaser and its representatives and agents, upon reasonable written notice and at reasonable times, access to the facilities, offices, personnel, professionals, customers and suppliers of Seller and to all books, records and lists of Seller relating to the Acquired Assets, including, without limitation, (i) all records relating to customers, suppliers or personnel of Seller (including, without limitation, customer and mailing lists) and (ii) all books, ledgers, files, reports, plans, drawings and operating records of Seller; (b) furnish Purchaser with such financial and operating data and other information with respect to the Business and the Acquired Assets as Purchaser shall reasonably request; (c) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; and (d) facilitate discussions between Purchaser and Seller's customers, suppliers and other parties with whom Seller conducts business.

**6.3** **Further Assurances**.

(a)     Seller will use commercially reasonable efforts (i) to obtain the entry of the Bidding Procedures Order on the Bankruptcy Court's docket as soon as practicable and no later than the seventh (7th) Business Day after the Execution Date; (ii) to hold the Auction no later than twenty (20) days after the date of entry of the Bidding Procedures Order; and (iii) to obtain the entry of the Sale Order on the Bankruptcy Court's docket as soon as practicable and no later than two Business Days after the conclusion of the Auction.

(b)     With respect to each Assumed Contract, to the extent required by the Bankruptcy Court, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract by Purchaser.  Purchaser shall take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of the Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c)     From time to time after the Closing and without further consideration, Seller, (i) upon the reasonable request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby and to vest in Purchaser title to the Acquired Assets transferred hereunder, or to otherwise more fully consummate the transactions contemplated by this Agreement, and (ii) subject to the Sale Order, Purchaser, upon the reasonable request of Seller, shall execute and deliver such documents and instruments of contract or lease assumption as Seller may reasonably request in order to confirm Purchaser's Liability for the Assumed Obligations or otherwise to more fully consummate the transactions contemplated by this Agreement.

16

**6.4**     **Bankruptcy Actions**.

(a)     As promptly as practicable, but in no event later than one (1)  Business Day after the date of this Agreement, Seller shall make all filings necessary to initiate the Chapter 11 Cases in the Bankruptcy Court (such actual filing date, the "Petition Date").

(b)     As promptly as practicable, but in no event later than three (3) Business Days after the Petition Date, Seller shall file in the Chapter 11 Cases a motion, in form and substance reasonably acceptable to Purchaser, seeking the entry of (a) the Bidding Procedures Order and (b) the Sale Order.

(c)     Subject to its obligations as a debtor-in-possession, Seller shall promptly make any filings, take all actions and use all commercially reasonable efforts to obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Transaction Documents.

(d)     Seller shall give notice to all parties entitled to notice of the Bidding Procedures Order, the Sale Order and any motions related thereto in accordance with all applicable Laws, the Rules and any applicable local rules, and to any other Persons reasonably requested by Purchaser.

(e)     Seller shall conduct any auction process in accordance with the Bidding Procedures.  Except as permitted by the Bidding Procedures Order or with Purchaser's consent, Seller shall comply with, and shall not amend, waive, modify or supplement, the Bidding Procedures.

(f)     Seller shall promptly notify Purchaser if any party appeals, requests a stay of, or seeks reconsideration of the Bidding Procedures Order or Sale Order and provide Purchaser a copy of any related notices, applications or motions within one (1) Business Day after receipt by Seller.

**6.5**     **Auction Procedures**.     Notwithstanding anything to the contrary in this Agreement, the following terms and conditions shall govern:

(a)     The sale of the Acquired Assets to Purchaser, the approval of this Agreement and the consummation of the transactions contemplated hereby are expressly subject to (i) higher or better offers that may be received and accepted by Seller at the Auction and (ii) entry of the Sale Order by the Bankruptcy Court.

(b)     Purchaser shall have the right, in its sole discretion, to raise the price for the Acquired Assets (or to otherwise improve its offer contained in this Agreement) at any time until the conclusion of the Auction.  Each such improvement by Purchaser in its bid at the Auction shall constitute an irrevocable and binding amendment to this Agreement.

(c)     The second highest or best bid (including Purchaser's bid if Seller accepts a competing bid) shall remain in effect as a "back-up" bid for a period of 30 days following the conclusion of the Auction.

DB1/ 67536618.7

(d)      Purchaser shall be entitled to "credit bid" the Breakup Fee and Expense Reimbursement such that no competing bid shall be deemed higher in amount unless such competing bid exceeds the Purchase Price herein (and the Assumed Obligations) by the amount of the Breakup Fee and Expense Reimbursement, plus the Bidding Increment.  The "<u>Bidding Increment</u>" for the initial overbid shall be $75,000 and all subsequent Bidding Increments shall be $50,000.

(e)      Only competing bids that are "<u>Qualified Bids</u>" shall be considered at the Auction.  To be a Qualified Bid, a competing bid must (i) exceed the Purchase Price (and the Assumed Obligations) by the sum of the Breakup Fee and Expense Reimbursement, plus the Bidding Increment, (ii) other than with respect to a Purchaser that is "credit bidding", be accompanied by an amount of cash equal to the Deposit and proof of such bidder's financial ability to pay the balance of the purchase price, and (iii) be accompanied by a signed, irrevocable asset purchase agreement substantially in the form of this Agreement and shall not be subject to any diligence or financing contingencies or any other conditions precedent to such Person's obligation to purchase the Acquired Assets other than as may be included in this Agreement. Purchaser shall be considered a qualified bidder and each of its bids shall be a Qualified Bid.

(f)      Seller and Purchaser shall cooperate in resolving or contesting any objections (including testimony or argument in Bankruptcy Court) to this Agreement, the Bidding Procedures Order or the Sale Order, and Purchaser and Seller shall bear their own costs relating thereto; provided, however, that Purchaser's costs relating thereto shall be considered part of the Expense Reimbursement up to the maximum cap of such Expense Reimbursement.

**6.6**    <u>**Other Bids**</u>.  Purchaser acknowledges that pursuant to the Bidding Procedures Order, Seller will solicit bids from other prospective purchasers for the sale of all or any portion of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement and in accordance with the procedures set forth in the Bidding Procedures Order.

**6.7**    <u>**Disclosure Schedules and Supplements**</u>.  Seller shall notify Purchaser in writing of, and shall supplement the Schedules to this Agreement with respect to, any matter that (a) arises after the Execution Date and that, if existing or occurring at or prior to the Execution Date, would have been required to be set forth or described in the Schedules to this Agreement or (b) makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Seller that has been rendered inaccurate thereby.  Each such notification and supplementation, to the extent known, shall be made no later than two (2) Business Days after discovery thereof.  None of such supplements to the Schedules shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement with respect to satisfaction of the conditions set forth in Section 7.1 or otherwise affect any other term or condition contained in this Agreement.

**6.8**    <u>**Conduct of Business Prior to Closing**</u>.  Except as expressly contemplated by this Agreement or with Purchaser's prior written consent, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court:

18

(a)    Seller shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than as required in the ordinary course of business;

(b)    Seller shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim or other encumbrance;

(c)    Seller shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a material breach of any representation or warranty made by Seller in this Agreement;

(d)    Seller shall notify Purchaser promptly in writing of any Material Adverse Effect;

(e)    Seller shall comply in all material respects with all Laws applicable to them or having jurisdiction over the Business or any Acquired Asset (excluding with respect to the Excluded Inventory in which case Seller shall make commercially reasonably efforts to comply with all Laws applicable to the Excluded Inventory);

(f)    Seller shall not enter into any Contract material to Seller (taken as a whole) to which Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets or assume, amend, modify, terminate or reject any Contract to which Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets (including any Assumed Contract);

(g)    Seller shall not cancel or compromise any material debt or claim or waive or release any right of Seller that constitutes an Acquired Asset;

(h)    Seller shall not terminate, reject, amend or modify in any manner any lease for leased real property (other than the Las Vegas Showroom Lease or otherwise pursuant to and in accordance with Section 2.6(a));

(i)    Seller shall use commercially reasonable efforts to (1) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the ordinary course, (2) preserve the existing business organization and management of the Business intact, (3) keep available the services of the current officers and employees of the Business, to the extent reasonably feasible, (4) maintain the existing relations with customers, distributors, suppliers, creditors, business partners, employees and others having business dealings with the Business, to the extent reasonably feasible, and (5) refrain from changing in any material respect any of their product prices or pricing policies (e.g., discount policies) for any of their products except as shall be necessary to meet competition or customer requirements; and

(j)    Seller shall not take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

19

**6.9**   **Casualty**.  If, between the Execution Date and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), then Purchaser shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the Casualty, or (b) in the event that the Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

**6.10**   **Refunds and Remittances**.  If Seller or any of its Affiliates, on the one hand, or the Purchaser or any of its Affiliates, on the other hand, after the Closing Date receives any funds properly belonging to the other party in accordance with the terms of this Agreement, the receiving party will promptly so advise such other party and will promptly deliver such funds to an account or accounts designated in writing by such other party.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser under this Agreement are subject to satisfaction, or waiver at the option of Purchaser, of the following conditions precedent on or before the Closing Date.

**7.1**   **Representations and Warranties; Covenants**.

(a)   Each of the representations and warranties of Seller contained herein that are qualified by materiality must be true and correct in all respects on and as of the Execution Date and on and as of the Closing Date, and each of such representations and warranties not qualified by materiality must be true and correct in all material respects on and as of the Execution Date and on and as of the Closing Date, (except, in each case, for representations and warranties made as of a specified date, which must be true and correct in all respects (or all material respects, as applicable), as of that date).

(b)   Seller shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

**7.2**   **Assumed Contracts**.  Seller shall have delivered to Purchaser fully executed copies of each of the Assumed Contracts at least three (3) Business Days prior to the Closing Date and such Assumed Contracts shall be acceptable to Purchaser in its sole discretion.

**7.3**   **Bankruptcy Court Approval**.  The Sale Order shall have been entered by the Bankruptcy Court shall have become a Final Order, and shall be in form reasonably satisfactory to Purchaser in its reasonable discretion.

**7.4**   **No Proceedings**.  No action or proceeding, at law or in equity, shall have been commenced by any Person to enjoin, restrict or prohibit the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal or right to such lease to appeal.

**7.5      No Material Adverse Effect**.  There shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

**7.6      Closing Deliveries**.  Seller shall have delivered to Purchaser all of the closing deliveries set forth in Section 3.2.

**ARTICLE 8**

**CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER**

The obligations of Seller under this Agreement are subject to satisfaction, or waiver at the option of Seller, of the following conditions precedent on or before the Closing Date.

**8.1      Representations and Warranties; Covenants**.

(a)      The representations and warranties of Purchaser contained herein that are qualified by materiality must be true and correct in all respects on and as of the Execution Date and on and as of the Closing Date, and each of such representations and warranties not qualified by materiality must be true and correct in all material respects on and as of the Execution Date and on and as of the Closing Date, (except, in each case, for representations and warranties made as of a specified date, which must be true and correct in all respects (or all material respects, as applicable), as of that date).

(b)      Purchaser shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

**8.2      Bankruptcy Court Approval**.  The Sale Order shall have been entered by the Bankruptcy Court and shall have become a Final Order.

**8.3      No Proceedings**.  No action or proceeding, at law or in equity, shall have been commenced by any Person to enjoin, restrict or prohibit the Closing, which has not, by the Closing Date, been dismissed, quashed or permanently stayed without any further right of appeal or right to such lease to appeal.

**8.4      Closing Deliveries**.  Purchaser shall have delivered to Seller the other closing deliveries set forth in Section 3.3.

21

## ARTICLE 9

## TERMINATION; TERMINATION PAYMENT

**9.1**    **Termination**.  This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written agreement of Purchaser and Seller;

(b)    automatically and without any action or notice by Seller to Purchaser, or Purchaser to Seller, and immediately upon the entry thereof, if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated under this Agreement;

(c)    by either Purchaser or Seller (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the other party, which breach would give rise to the failure of the condition set forth in Section 7.1 or Section 8.1, as applicable, and such breach is not cured within ten (10) days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

(d)    by Purchaser, if the Bidding Procedures Order shall not have been entered by July 13, 2011;

(e)    by Purchaser, if the Auction shall not have commenced by the date that is twenty (20) days after the date of entry of the Bidding Procedures Order;

(f)    by Purchaser, if the Sale Order shall not have been entered on the date that is two (2) Business Days following the conclusion of the Auction;

(g)    by Purchaser or Seller if the Bankruptcy Court enters an order approving any proposal (other than by Purchaser or its Affiliates) relating to any merger, consolidation, business combination, transfer, sale or other disposition of 10% or more of the Acquired Assets pursuant to one or more transactions (including, without limitation, by way of a tender offer, foreclosure or plan of reorganization or liquidation);

(h)    by Purchaser on any day on or after the fortieth (40th) day following the Execution Date if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Seller in writing), provided that the right to terminate this Agreement under this Section 9.1 shall not be available to the Purchaser if its failure fulfill any obligation under this Agreement has been a significant cause of, or resulted in, the failure of the Closing on or before such date;

(i)    by Purchaser, if, prior to the Closing the Chapter 11 Case shall have been converted to a case under chapter 7 of the Bankruptcy Code or dismissed;

22

(j)    by Purchaser, if there shall be excluded from the Acquired Assets any Assumed Contract that is not assignable or transferable under the Bankruptcy Code or otherwise without the consent of any person other than Seller, to the extent such consent shall not have been given prior to the Closing and such Assumed Contract shall, in the opinion of Purchaser in its sole discretion, prevent it from effectively operating the Business.

(k)    by Purchaser, within three (3) Business Days after each initial delivery by Seller to Purchaser of a fully executed copy of an Assumed Contract, if Purchaser, in its sole discretion, is not satisfied with the terms of such Assumed Contract;

(l)    by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in ARTICLE 7 has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied); and

(m)    by Seller (provided that Seller is not in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in ARTICLE 8 has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied).

**9.2    Breakup Fee and Expense Reimbursement**.

(a)    If the transactions contemplated hereby are not consummated for any reason other than a Purchaser Default Termination, (i) Seller shall immediately pay (in cash) to Purchaser (x) an amount equal to $35,000 as a breakup fee, and (y) an amount equal to the reasonable, actual and necessary costs and out-of-pocket expenses incurred by Purchaser in connection with its legal, accounting and business due diligence and the preparation and negotiation of this Agreement up to a maximum of $50,000 (collectively, the "Breakup Fee and Expense Reimbursement") and (ii) the Escrow Agent shall disburse the Deposit to Purchaser in accordance with Section 2.4.

(b)    Seller's obligation to pay the Breakup Fee and Expense Reimbursement pursuant to this Section 9.2 shall constitute an administrative expense (which shall be a super-priority administrative expense claim senior to all other administrative expense claims other than, with respect to the fees payable pursuant to Section 9.2(a)(i)(x) only, with respect to the fees of Jones & Walden, LLC) of Seller under section 364(c) of the Bankruptcy Code.

**9.3    Effect of Termination or Breach**.  If the transactions contemplated hereby are not consummated:  (a) this Agreement shall become null and void and of no further force and effect, except (i) for this Section 9.3, (ii) for the provisions of Sections 2.4, 9.2, 11.1, 11.7, 11.8, 11.9, 11.10 and 11.12 hereof, and (iii) that the termination of this Agreement for any cause shall not relieve any party hereto from any Liability which at the time of termination had already accrued to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination; and (b) the return of the Deposit, as well as the

23

payment of the Breakup Fee and Expense Reimbursement, if required under <u>Section 9.2</u>, shall be the sole and exclusive remedy (as liquidated damages) of Purchaser.

**ARTICLE 10**

**ADDITIONAL POST-CLOSING COVENANTS**

**10.1    <u>Employees</u>**.

(a)    Purchaser shall have the right, but not the obligation, to offer employment to any or all of the employees of Seller as Purchaser determines in its sole discretion (collectively, the "<u>Eligible Employees</u>"), <u>provided</u> that all Eligible Employees shall be offered employment under wage terms substantially comparable to those enjoyed by the Eligible Employees immediately prior to the Closing Date and under non-equity based employee benefit plans that provide substantially the same level of coverage and benefits as those provided to similarly situated employees of Purchaser (and in no event materially less than those provided by Seller).    Notwithstanding the foregoing, the parties to this Agreement contemplate that substantially all of Seller's employees are Eligible Employees.  Seller shall use its commercially reasonable efforts to assist Purchaser in employing as new employees of Purchaser, all Eligible Employees to whom Purchaser has offered employment pursuant to this <u>Section 10.1</u>. All Eligible Employees who accept Purchaser's offer of employment are herein referred to as "<u>Rehired Employees</u>."

(b)    For purposes of the WARN Act and applicable state Laws, (i) Rehired Employees shall become employees of Purchaser on the Closing Date, and (ii) Purchaser shall assume all responsibility for any WARN Act notice or other WARN obligation with regard to any terminations or layoffs by Purchaser following the Closing.

**10.2    <u>Employee Benefit Plans</u>**.  Except as otherwise specified in this Agreement, Seller shall retain (a) all Liabilities and obligations in respect of its past, present and future employees including the Rehired Employees, under applicable Laws and (b) all Liabilities and obligations under any "employee benefit plan" within the meaning of Section 3.3 of ERISA and any other employee benefit plan or program maintained or contributed by Seller or any ERISA Affiliate, and Purchaser shall have no Liability or obligation whatsoever under such employee benefit plans, nor shall Purchaser assume the sponsorship of such employee benefit plans.

**10.3    <u>Joint Post-Closing Covenant of Purchaser and Seller</u>**.  Purchaser and Seller jointly covenant and agree that, from and after the Closing Date, Purchaser and Seller will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (a) the preparation of an audit of any Tax Return of either Seller or Purchaser for all periods prior to or including the Closing Date and (b) any audit of Purchaser and/or any audit of Seller with respect to the sales, transfer and similar Taxes imposed by the Laws of any state or political subdivision thereof, relating to the transactions contemplated by this Agreement.  In furtherance hereof, Purchaser and Seller further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith.    All costs and

24

expenses incurred in connection with this <u>Section 10.3</u> referred to herein shall be borne by the party who is subject to such action.

**10.4    <u>Tax Matters</u>**.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid by Seller and Seller shall indemnify, defend (with counsel reasonably satisfactory to Purchaser), protect, and save and hold Seller harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes.

(b)    Purchaser shall, within the later of (i) 120 days after the Closing Date or (ii) 30 days prior to the date by which Seller's federal income Tax Returns must be filed, prepare and deliver to Seller a schedule allocating the Purchase Price among Seller and the Acquired Assets (such schedule, the "<u>Allocation</u>").   Purchaser and Seller shall report and file all Tax Returns consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Authority or any other proceeding).   Purchaser and Seller shall cooperate in the filing of any forms (including Form 8594 under section 1060 of the Code) with respect to such Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price.   Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 10.4(b)</u> shall survive the Closing without limitation.

## **ARTICLE 11**

## **MISCELLANEOUS**

**11.1    <u>Expenses</u>**.

(a)    Except as provided in <u>Section 9.2</u> hereof, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby.   Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding (i.e., the party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

(b)    The parties hereto agree that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Purchaser or Seller in connection with this transaction, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify (with counsel reasonably satisfactory to the party or parties entitled to indemnification) and hold the other harmless from and against any and all such claims or

25

demands asserted by any Person, firm or corporation in connection with the transaction contemplated hereby.

**11.2**    <u>Amendment</u>.  This Agreement may not be amended, modified or supplemented except by a written instrument signed by Seller and Purchaser.

**11.3**    <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by telex, telecopy, e-mail, or other wire transmission, (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service, or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid.  Unless another address is specified in writing, any notice, request, instruction or other documents given to the parties to this Agreement shall be sent to the addresses indicated below:

|  |  |
|---|---|
| To Purchaser: | Teters Floral Products, Inc.<br>1425 South Lillian Avenue<br>Bolivar, MO  65613<br>Attn:   Mark Johnson<br>Tel:    417-326-7654<br>Fax:    417-326-8061<br>E-mail:  markj@teters.com |
| with a copy to: | Morgan, Lewis & Bockius LLP<br>101 Park Avenue<br>New York, NY  10178<br>Attn:    Steven Navarro<br>           Neil E. Herman<br>Tel:     212-309-6000<br>Fax:     212-309-6001<br>Email:  snavarro@morganlewis.com<br>            nherman@morganlewis.com |
| To Seller: | Napa Home & Garden, Inc.<br>3270 Summit Ridge Parkway Suite 240<br>Duluth, GA 30096<br>Attn:    Jerry Cunningham<br>Tel:     770-255-2323<br>Fax:     770-255-2525<br>E-mail:  jerry@napahomeandgarden.com |
| with a copy to: | Jones & Walden, LLC<br>21 8th Street NE<br>Atlanta, GA 30309<br>Attn:    Leon S. Jones<br>Tel:     404-564-9300<br>Fax:     404-564-9301 |

Email: ljones@joneswalden.com
lpineyro@joneswalden.com

**11.4    Waivers**.    The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.    No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Seller or Purchaser, as applicable, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

**11.5    Counterparts and Execution**.    This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.    Any counterpart may be executed by facsimile signature or ".pdf" format signature and such signature shall be deemed an original.

**11.6    Headings**.    The headings preceding the text of the Articles and Sections of this Agreement and the Schedules are for convenience only and shall not be deemed part of this Agreement.

**11.7    SUBMISSION TO JURISDICTION**.    THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.

**11.8    Governing Law; Jurisdiction**.    This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.    For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.    After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in Georgia.

**11.9    Binding Nature; Assignment**.    Upon the approval of this Agreement by the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed), except:  (a) the rights and interests of Seller hereunder may be assigned to a trustee appointed under Chapter 7 of the Bankruptcy Code; (b) this Agreement may be assigned to any entity appointed as a successor to Seller pursuant to a confirmed Chapter 11 plan; (c) Purchaser

27

may transfer and assign this Agreement and the rights, interest and obligations hereunder (i) to one or more of its Affiliates, (ii) in connection with a sale of all or substantially all of its assets or all or substantially all of the assets comprising the Business, or (iii) for collateral security purposes to any lender providing financing to the Purchaser or any of its Affiliates; and (d) as otherwise provided in this Agreement.  Seller hereby agrees that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 7 of the Bankruptcy Code.

**11.10    No Third Party Beneficiaries**.  This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement.

**11.11    Construction**.  The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference to any federal, state, local or foreign Law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise.

**11.12    Entire Understanding**.  This Agreement, the Exhibits and the Schedules set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement, the Exhibits and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

**11.13    Closing Actions**.  All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

**11.14    Conflict Between Transaction Documents**.  The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other Transaction Document referred to herein, this Agreement shall govern and control.

**11.15    No Survival**.  The representations and warranties of Seller and Purchaser contained in this Agreement or in any instrument delivered in connection herewith shall not survive the Closing, other than in the case of fraud.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered on the date first above written.

**PURCHASER:**

**TETERS FLORAL PRODUCTS, INC.**

By _____

Name: Mark Johnson

Title: President & CEO

**SELLER:**

NAPA HOME AND GARDEN, INC.

By _____

    Name: Gerald Cunningham

    Title: CEO

DISCLOSURE SCHEDULES

to

ASSET PURCHASE AGREEMENT

by and among

TETERS FLORAL PRODUCTS, INC.

and

NAPA HOME AND GARDEN, INC.

Dated as of _____, 2011

Capitalized terms used but not defined herein shall have the meaning
ascribed to them in the Asset Purchase Agreement.

Schedule 1.1(a)

Assumed Contracts

1. Closed-End Vehicle Lease Agreement, dated as of January 26, 2011, between Napa Home and Garden Inc. and Gwinnett Place Honda.
2. Customer Purchase Orders open as of the Closing Date, excluding with respect to Excluded Inventory products.

Schedule 1.1(c)

Excluded Inventory

| SKU | DESCRIPTION |
|---|---|
| 1050-A | FL MOONLIGHT MAGIC - AQUA |
| 1050-G | FL MOONLIGHT MAGIC - GREEN |
| 1050-H | FL MOONLIGHT MAGIC - HONEY |
| 1051-R | FL SAMBA - RED |
| 1052-G | FL FANTASY - GREEN |
| 1052-MX | FL FANTASY - MIXED |
| 1052-Y | FL FANTASY - YELLOW |
| 1053-G | FL STARLITE - GREEN |
| 10544CBX-A | FL HONEY POT IN A 4 COLOR BOX AQUA |
| 10544CBX-G | FL HONEY POT IN A 4 COLOR BOX GREEN |
| 10544CBX-R | FL HONEY POT IN A 4 COLOR BOX RED |
| 1054-A | FL HONEY POT - AQUA |
| 1054-G | FL HONEY POT - GREEN |
| 1054-OG | FL HONEY POT - OLIVE GREEN |
| 1054-R | FL HONEY POT - RED |
| 1055-G | FL ROMANTIC - GREEN |
| 1055-OG | FL ROMANTIC - OLIVE GREEN |
| 1055-R | FL ROMANTIC - RED |
| 10564CBX-G | FL PARTY TIME IN A 4 COLOR BOX |
| 10564CBX-RG | FL PARTY TIME IN 4 COLOR BOX |
| 10564CBX-Y | FL PARTY TIME IN A 4 COLOR BOX |
| 1056-BL | FL PARTY TIME BLUE |
| 1056-G | FL PARTY TIME - GREEN |
| 1056-MP | PARTY TIME 112 PC MINI PALLET |
| 1056-OG | FL PARTY TIME - OLIVE GREEN |
| 1056-R | FL PARTY TIME - RED |
| 1056-RG | FL PARTY TIME - RED GOLD |

| 1056-Y | FL PARTY TIME - YELLOW |
|---|---|
| 1057-G | FL TANGO - GREEN |
| 1057-Y | FL TANGO |
| 1058-CR | FL HOT SALSA - CREAM |
| 1058-R | FL HOT SALSA - RED |
| 1059-G | FL ILLUME |
| 10604CBX-G | FL SUNSET IN A 4 COLOR BOX |
| 10604CBX-R | FL SUNSET IN A 4 COLOR BOX |
| 1060-G | FL SUNSET - GREEN |
| 1060-R | FL SUNSET - RED |
| 1061-MX | FL OOH-LA-LA - MIXED |
| 1062-BR | FL ENCHANTED BROWN |
| 1063-TC | FL ALLURE |
| 1064-G | FL ELEGANT BUTTERFLY WITH LID |
| 1064-R | FL ELEGANT BUTTERFLY WITH LID |
| 1070-B | FL OBSESSION - BLUE W/LID |
| 1070-G | FL OBSESSION - GREEN W/LID |
| 1070-MX | FL OBSESSION - MIXED GLAZE W/LID |
| 1070-R | FL OBSESSION - RED W/LID |
| 1070-TQ | FL OBSESSION - TURQUOISE  W/LID |
| 1071-B | FL JUBILEE - BLUE W/LID |
| 1071-G | FL JUBILEE - GREEN W/LID |
| 1071-R | FL JUBILEE - RED W/LID |
| 1071-TQ | FL JUBILEE TURQUOISE W/ LID |
| 1071-Y | FL JUBILEE - YELLOW W/LID |
| 1072-R | FL SERENADE - RED W/LID |
| 1072-TQ | FL SERENADE - TURQUOISE W/LID |
| 1072-Y | FL SERENADE - YELLOW W/LID |
| 1073-BR | FL BAMBOO - BROWN W/LID |
| 1073-G | FL BAMBOO - GREEN W/LID |
| 10744CBX-G | FL PASSION VINE IN A 4 COLOR BOX GR |
| 10744CBX-R | FL PASSION VINE IN A 4 COLOR BOX R |
| 10744CBX-TQ | FL PASSION VINE IN A 4 COLOR BOX TQ |
| 1074-BK | FL PASSION VINE - BLACK W/LID |
| 1074-G | FL PASSION VINE - GREEN W/LID |
| 1074-R | FL PASSION VINE - RED W/LID |
| 1074-TQ | FL PASSION VINE - TURQUOISE W/LID |
| 10754CBX-R | FL BALI IN A 4 COLOR BOX RED |
| 10754CBX-TQ | FL BALI IN A 4 COLOR BOX TQ |
| 1075-R | FL BALI - RED W/LID |
| 1075-TQ | FL BALI - TURQUOISE WITH LID |
| 1076-ORG | FL VENUS - ORANGE W/LID |

3

| 1076-Y | FL VENUS - YELLOW W/LID |
|---|---|
| 1077-G | FL GALAXY - GREEN  W/LID |
| 1077-TQ | FL GALAXY - TURQUOISE W/LID |
| 1077-Y | FL GALAXY - YELLOW |
| 1078-BK | FL LION TOWER - MATTE BLACK W/LID |
| 1078-MR | FL LION TOWER |
| 1078-MW | FL LION TOWER MATTE WHITE |
| 1078-R | FL LION TOWER - RED W/LID |
| 1078-TQ | FL LION TOWER - TURQUOISE W/LID |
| 1080-MB | FL MONTICELLO WITH LID |
| 1080-MR | FL MONTICELLO WITH LID |
| 1080-MW | FL MONTICELLO WITH LID |
| 1082-BR | FL CHA CHA CHA WITH LID |
| 1082-G | FL CHA CHA CHA WITH LID |
| 1082-R | FL CHA CHA CHA WITH LID |
| 1082-TQ | FL CHA CHA CHA WITH LID |
| 10834CBX-G | FL LITTLE GEM GREEN FOUR COLOR BOX |
| 10834CBX-R | FL LITTLE GEM FOUR COLOR BOX - RED |
| 10834CBX-TQ | FL LITTLE GEM IN FOUR COLOR BOX TQ |
| 10834CBX-Y | FL LITTLE GEM 4 COLOR BOX - YELLOW |
| 1083-BR | FL LITTLE GEM WITH LID |
| 1083-G | FL LITTLE GEM WITH LID GREEN |
| 1083-TQ | FL LITTLE GEM WITH LID |
| 1083-Y | FL LITTLE GEM WITH LID |
| 1086-G | FL SWEET PEA WITH LID |
| 1086-L | FL SWEET PEA WITH LID |
| 1086-R | FL SWEET PEA WITH LID RED |
| 1086-TQ | FL SWEET PEA WITH LID |
| 1086-W | FL SWEET PEA WITH LID WHITE |
| 10874CBX-R | FL TANGO 4 COLOR BOX - RED |
| 1087-BR | FL WALNUT FINISH URN W LID BROWN |
| 10884CBX-G | FL APOLLO 4 COLOR BOX - GREEN |
| 1088-BR | FL  WALNUT FINISH SPHERE W/ LID BRN |
| 10894CBX-ORG | FL STARDUST 4 COLOR BOX - ORANGE |
| 10904CBX-BL | FL LUNA 4 COLOR BOX BLUE |
| 1091-RB | FL EMBROIDERY BALL ROYAL BLUE |
| 1092-R | FL APPLE JAR RED |
| 1093-BR | FL SEASHELL BROWN |
| 1093-RB | FL SEASHELL - ROYAL BLUE |
| 1094-RB | FL LANTERN ROYAL BLUE |
| 1095-G | FL JACQUE GREEN |
| 1095-GY | FL JACQUE GRAY |

| 1095-W | FL JACQUE WHITE |
| 1095-Y | FL JACQUE YELLOW |
| 1096-G | FL COQUETTE GREEN |
| 1096-GY | FL COQUETTE GRAY |
| 1096-W | FL COQUETTE FACE WHITE |
| 1096-Y | FL COQUETTE YELLOW |
| 1097-TQ | FL GOLDFISH TURQUOISE |
| 1097-W | FL GOLDFISH WHITE |
| 1098-B | FL LUNA BLUE |
| 1098-G | FL LUNA GREEN |
| 1098-TQ | FL LUNA TURQUOISE |
| 1099-BR | FL VINTAGE FIRELITE COLUMN BROWN |
| 1099-G | FL VINTAGE FIRELITE COLUMN  GREEN |
| 1099-R | FL VINTAGE FIRELITE COLUMN RED |
| 1099-TQ | FL VINTAGE FIRELITE COLUM TURQUOISE |
| 1099-Y | FL VINTAGE FIRELITE COLUMN YELLOW |
| 1100-BR | FL VINTAGE FLARED POT BROWN |
| 1100-G | FL VINTAGE  FIRELITE POT GREEN |
| 1100-R | FL VINTAGE FIRELITE POT RED |
| 1100-TQ | FL VINTAGE FIRELITE POT TURQUOISE |
| 1100-Y | FL VINTAGE FIRELITE POT YELLOW |
| 1150-B | FL TERRAZZO 12" TOWER BLACK |
| 1170-B | FL 12" TERRAZZO TOWER SMALL |
| 1170L-B | FL 40" TERRAZZO TOWER  LG |
| 1170M-B | FL TERRAZZO TOWER  MED BLACK |
| 1171-B | FL TERRAZZO COLBY W/LID LARGE |
| 1171M-B | FL TERRAZZO MED COLBY W/LID BLACK |
| 1172-B | FL 8" TERRAZZO SHERE BLACK |
| 1172-GY | FL 8" TERRAZZO SPHERE GREY |
| 1172M-B | FL 6" TERRAZZO SPHERE BLACK |
| 1172M-GY | FL 6" TERRAZZO SPHERE GREY |
| 1173-B | FL TERRAZZO ARIS POT W/LID BLACK |
| 1174-B | FL CUBE 5.5" BLACK |
| 1175-B | FL CUBE 8" BLACK |
| 1176-B | FL ROUND TERRAZZO FIRELITE W PLATE |
| 1177-B | FL LARGE HEXAGON TERRAZZO FIRELITE |
| 1178-B | FL MEDIUM HEXAGON TERRAZZO FIRELITE |
| 1179-B | FL SMALL HEXAGON TERRAZZO FIRELITE |
| 1180-RB | FL CASSANDRA GLOBE STONEWARE RB |
| 1181-R | FL IMPERIAL JAR STONEWARE RED |
| 1182-RB | FL SEASHELL  STONEWARE ROYAL BLUE |
| 1182-S | FL SEASHELL STONEWARE  SAND |

| | |
|---|---|
| 1183-RB | FL  TORINO LANTERN STONEWARE ROY BL |
| 1184-G | FL ACANTHUS GREEN |
| 1184-R | FL ACANTHUS RED |
| 1184-W | FL ACANTHUS WHITE |
| 1185-L | FL AEGEAN JAR LAVENDER |
| 1185-R | FL COOKIE JAR RED |
| 1185-TQ | FL COOKIE JAR |
| 1186-R | FL RING AROUND RED |
| 1186-W | FL RING-AROUND WHITE |
| 1186-Y | FL RING-AROUND YELLOW |
| 1187-G | FL ECHELEON GREEN |
| 1187-H | FL ECHELEON HONEY |
| 1187L-H | FL GRANDE ECHELEON |
| 1187-R | FL ECHELEON RED |
| 1188-L | FL PROVENCAL LAVENDER |
| 1188-R | FL PROVENCAL RED |
| 1188-Y | FL PROVENCAL YELLOW |
| 1189-GD | FL HOLLYWOOD GLAMOUR GOLDEN SPHERE |
| 1189-SV | FL HOLLYWOOD GLAMOUR SILVER SPHERE |
| 1190-GD | FL HOLLYWOOD SASHAY GOLD |
| 1190-SV | FL HOLLYWOOD SASHAY SILVER |
| 1191-GY | FL ROCK & ROLL SQ |
| 1200-GY | FL CEMENT FIREPIT |
| 1201-GY | FL ROCK & ROLL |
| 1202-MB | FL MONTICELLO COLUMN BLACK |
| 1202-MR | FL MONTICELLO COLUMN RED |
| 1202-MW | FL MONTICELLO COLUMN WHITE |
| 1203-GR | FL FDL TALL URN GREEN |
| 1203-TQ | FL FDL TALL  URN BLUE |
| 1203-W | FL FDL TALL URN WHITE |
| 1204-BR | FL FLEUR DE LIS - MUSHROOM |
| 1204-OG | FL FLEUR DE LIS GREEN |
| 1204-TQ | FL FLEUR DE LIS TURQUOISE |
| 1205-BR | FL FLAME MUSHROOM |
| 1205-GR | FL FLAME GREEN |
| 1205-R | FL FLAME RED |
| 1205-TQ | FL FLAME TURQUOISE |
| 1205-Y | FL FLAME YELLOW/GREEN |
| 1206-BL | FL TINY BUBBLES URN BLUE |
| 1206-G | FL TINY BUBBLES URN TURQUOISE |
| 1206-OG | FL TINY BUBBLES URN OLIVE GREEN |
| 1206-R | FL TINY BUBBLES URN RED |

| | |
|---|---|
| 1207-G | FL TINY BUBBLES GREEN |
| 1207-R | FL TINY BUBBLES RED |
| 1207-TQ | FL TINY BUBBLES TURQUOISE |
| 1208-G | FL ALI BABBA GREEN |
| 1208-TQ | FL ALI BABBA TURQUOISE |
| 1208-Y | FL ALI BABBA - YELLOW |
| 1209-BK | FL ROLL OVER CLOVER URN BLACK |
| 1209-BR | FL CLOVER URN |
| 1209-G | FL ROLL OVER CLOVER URN GREEN |
| 1209-R | FL ROLL OVER CLOVER URN RED |
| 1209-TQ | FL ROLL OVER CLOVER URN TURQUOISE |
| 1209-W | FL ROLL OVER CLOVER URN WHITE |
| 1210-RG | FL SERENITY RED GOLD |
| 1210-Y | FL SERENTIY YELLOW |
| 1211-A | FL HEAVENLY CROSS AQUA |
| 1211-R | FL HEAVENLY  CROSS RED |
| 1211-W | FL HEAVENLY CROSS WHITE |
| 1212-BL | FL FISHERMAN'S FIRELITE BLUE |
| 1213-MB | FL 19.5" MAGNIFICENT RING OF FIRE |
| 1214-RG | FL CHRISTIAN FIRELITE RED GOLD |
| 1215-DG | KINGS ROAD FIRELITE |
| 1216-GY | FL DOVER URN |
| 1217-GY | FL DOVER CYLINDER |
| 1217-MB | FL 12.5" GREAT BOWL OF FIRE |
| CL109-DG | CL FIRELITE TOWER CONCETERLITE GREY |
| FB0007 | FIREGEL GEL FUEL 2 PACK |
| FB0008 | FIREGEL QUART 32 OZ BTL  1 BOTTLE |
| FB0009 | FIREGEL QUART CITRONELLA (1) 32 OZ |
| FB0010 | FIREGEL GEL FUEL CASE/6BTL |
| FB0011 | FIREGEL GEL FUEL W/CITRON 6 BTS |
| FB0012 | FIREGEL GEL FUEL INDIVIDUAL BOTTLE |
| FB0012C | FIREGEL GEL FUEL IND BOTTLE-CANADA |
| FB0013 | FIREGEL GEL FUEL W/CITR SINGLE BTL |
| FB0013C | FIREGEL GEL FUEL W/CITR SINGLE BTL |
| FB0014 | FIREGEL GALLON 4 PER CASE |
| FB0015 | FIREGEL CITRONELLA GALLON/4 PER CS |
| FB0016 | FIREGEL 1 GALLON/3.785 LITER |
| FB0017 | FIREGEL CITRONELLA 1 GALL/3.785 LT |
| FB0020 | FB DISPLAY SHELF |
| FB0021 | FB DIE CUT BLANK INSERT |
| FB0022 | FB STANDING FLAME CUT OUTS |
| FB0023 | FB RSC BOXES/PLAIN KRAFT |

| FB1006 | FB DISPLAY SHELF |
| FB4CBX100-BL | FB 4CBX WAVE BLUE, CASE PACK OF 6 |
| FB4CBX100-BL | FB 4CBX WAVE BLUE, CASE PACK OF 6 |
| FB4CBX100-G | FB 4CBX WAVE GREEN, CASE PACK OF 6 |
| FB4CBX100-G | FB 4CBX WAVE GREEN, CASE PACK OF 6 |
| FB4CBX100-R | FB 4CBX WAVE RED, CASE PACK OF 6 |
| FB4CBX100-R | FB 4CBX WAVE RED, CASE PACK OF 6 |
| FB4CBX101-G | FB 4CBX DOME GREEN |
| FB4CBX101-R | FB 4CBX DOME RED, CASE PACK OF 6 |
| FB4CBX101-R | FB 4CBX DOME RED, CASE PACK OF 6 |
| FB4CBX101-Y | FB 4CBX DOME YELLOW, CASE PACK OF 6 |
| FB4CBX101-Y | FB 4CBX DOME YELLOW, CASE PACK OF 6 |
| FL0006 | NAPAfire GEL FUEL W/ CITRONEL |
| FL0007 | NAPAfire GEL FUEL CASE OF 2 |
| FL0008 | NAPAfire GEL FUEL 32 OZ BTL  (1) |
| FL0008C | NAPAFIRE CANADA 32OZ BTL (1) REG |
| FL0009 | NAPAfire GEL FUEL W/CITRONELLA  (1) |
| FL0009C | NAPAFIRE CANADA 32OZ BTL (1) CITRON |
| FL0010 | NAPAFIRE GEL FUEL CASE/6 BTLS |
| FL0010C | NAPAFIRE CANADA GEL 6 BOTTLE CASE |
| FL0011 | NAPAfire GEL FUEL  W/CITRON 6 BTLS |
| FL0011C | NAPAFIRE CANADA CITRONELLA 6 BTL CS |
| FL0012 | NAPAfire GEL FUEL CASE/12 BTLS |
| FL0012C | NAPAFIRE CANADA GEL FUEL 12 BTL CAS |
| FL0013 | NAPAfire GEL FUEL CASE 12 W/ CITRO |
| FL0013C | NAPAFIRE CANADA GEL FUEL 12 BTL CS |
| FL0014 | NAPAFIRE GALLONS 4 PER CASE REGULAR |
| FL0014C | NAPAFIRE GALLONS 4 /CASE REG CANADA |
| FL0015 | NAPAFIRE GALLONS 4 PER CASE CITRO |
| FL0015C | NAPAFIRE GALLONS 4/CASE CITRO CANAD |
| FL0016 | NAPAFIRE 1 GALLON/3.785 LITER |
| FL0016C | NAPAFIRE 1 GALLON/3.785 LITR CANADA |
| FL0017 | NAPAFIRE CITRONELLA 1 GALL/3.785 LT |
| FL0017C | NAPAFIRE CITRONELLA 1 GALL CANADA |
| FL012 | FL COOL IT TRIGGER SPRAY CASE OF 6 |
| FL013 | FL COOL IT TRIGGER SPRAY 16OZ BOTTL |
| FL014 | FL COOL IT AEROSOL CASE OF 6 |
| FL015 | FL COOL IT AEROSOL 15 OZ ONE BOTTLE |
| FL1003 | FL 3.5 H REPLACEMENT CUP |
| FL1004 | FL FLAME SNUFFER |
| RHFL0010 | NAPAFIRE GEL FUEL CASE/6 BTLS |
| RHFL0011 | NAPAfire GEL FUEL  W/CITRON 6 BTLS |

| | |
|---|---|
| SK10544CBX-A | SHOPKO FL HONEY POT AQUA |
| SK10544CBX-G | SHOPKO FL HONEY POT GREEN |
| SK10544CBX-R | SHOPKO FL HONEY POT RED |
| SK10564CBX-G | SHOPKO FL PARTY TIME GREEN |
| SK10564CBX-RG | SHOPKO PARTY TIME RED GOLD |
| SK10564CBX-Y | SHOPKO FL PARTY TIME YELLOW |
| SK10604CBX-G | SHOPKO FL SUNSET GREEN |
| SK10604CBX-R | SHOPKO FL SUNSET RED |
| SK10784CBX-BK | SHOPKO FL LION TOWER BLACK W/LID |
| SK10784CBX-MR | SHOPKO FL LION TOWER MATTE RED |
| SK10784CBX-SB | SHOPKO FL LION TOWER SHINY BLACK |
| SK10784CBX-SR | SHOPKO FL LION TOWER SHINY RED |
| SK10834CBX-G | SHOPKO FL LITTLE GEM GREEN |
| SK10834CBX-TQ | SHOPKO FL LITTLE GEM TURQUOISE |
| SK10834CBX-Y | SHOPKO FL LITTLE GEM YELLOW |

<u>Schedule 4.3</u>

Title to Assets

| CONTRACT NAME | DESCRIPTION |
|---|---|
| American Honda | Honda Pilot |
| Cintas | Janitorial/Hygiene Products purchased |
| Cbeyond | Phone line provider |
| Idealease | Delivery Truck |
| Pitney Bowes | Postage Machine Rental |
| Wells Fargo | Konica Copier |

Schedule 4.6

Cure Payments

1.  Closed-End Vehicle Lease Agreement, dated as of January 26, 2011, between Napa
    Home and Garden Inc. and Gwinnett Place Honda.
    a.  Cure  Payment - $0.00
2.  Customer Purchase Orders open as of the Closing Date excluding with respect to
    Excluded Inventory products.
    a.  Cure Payment - $0.00

Schedule 4.7

Acquired Inventory Locations:

1.  Main Warehouse is:  Duluth 3270 Summit Ridge Parkway, Duluth GA  30096

2.  Atlanta Showroom:  Americas Mart Building 2 and 2West  10th Floor #1037A and #10A37

3.  High Point Showroom:  IHFC Building Hamilton Wind #420 High Point NC

4.  Las Vegas Storage:  Storage One  481 South Decatur  Blvd. Las Vegas Nevada

<u>Schedule 4.8</u>

<u>Intellectual Property</u>

(a)

<u>Patents</u>
None

<u>Trademarks (all unregistered)</u>
Napa Home & Garden
Terrazzolite
Fibreclay
Concretelite
Preserved Greens
Fantasy Flowers
Green Thumbs Not Required
It only looks heavy

<u>Copyrights</u>
None

<u>Trade names, Domain Names and Service Marks</u>
**All Unregistered:**
Napa Home & Garden
Preserved Greens  - unregistered name of a collection:
" Green thumbs not required"
"Fantasy Flowers"
"it only looks heavy"
Fibreclay
Terrazzolite
Concretelite
PRESERVED BOTANICALS

**WWW.NAPAHOMEANDGARDEN.COM.**

(b)

There are not any restrictions on use of the above.

Schedule 4.9
Real Property Leases

| CONTRACT NAME | DESCRIPTION | NOTES |
|---|---|---|
| Atlanta Showroom | Atlanta Showroom | Lease through November 30, 2014 |
| HomeStyle Atlanta & Dallas | Showroom Shared Space Rental | Due January & July 2011 |
| WMCV | Las Vegas Showroom | Lease through May 31, 2016 |
| Cobalt Industrial | Duluth Office/Warehouse | Lease through April 30, 2017 |
| IHFC Properties | High Point Showroom | Lease through October 31, 2014 |
| Storage One | Storage Unit Agreement | LV inventory storage |

Schedule 4.10

Insurance

(a) Policies

**Package Policy –** Allied Insurance – Policy number ACP7123714050

**NV Location Package Policy –** Allied Insurance – Policy number ACP BPW7123714050

**EPLI (Employment Practices Liability) Policy –** Scottsdale Indemnity – Policy number EKI3027318

**Work Comp Policy –** Zurich Insurance – Policy number WC0449995200

**Fiduciary Policy –** Travelers Insurance – Policy number 105579112

(b)  Pending claims and the claim history:

|  | Insurance Claims 2009, 2010 and 2011 |  |  |  |
| --- | --- | --- | --- | --- |
| Allied Insurance |  |  |  |  |
| Date | Claim No. | Claimant name | Description | Status |
| 2/9/2010 | 10A20909 | Nationwide Claim 77 10 PE 020874 020910 51 | Claimant fell on premises | closed |
| 9/17/2010 | 10A24439 | Nationwide Claim 77 10 PE 025165 091710 51 | Employee Damage to Customer Vehicle | closed |
| 7/10/2010 | 10A26438 | Nationwide Claim 77 10 PE 027722 071010 51 | Injury from Burn | open |
| 4/15/2011 | 10A28187 | Nationwide Claim 77 10 PE 030128 041511 51 | Injury from Burn | open |
| 4/16/2011 | 10A28702 | Nationwide Claim 77 10 PE 030905 041611 51 | Injury from Burn | open |
| 6/11/2011 | 10A28787 | Nationwide Claim 77 10 PE 031020 061111 51 | Injury from Burn | open |
| 6/17/2011 | 10A28884 | Nationwide Claim 77 10 PE 031165 061711 51 | Injury from Burn | open |
| 5/28/2011 | 10A28900 | Nationwide Claim 77 10 PE 031184 052811 51 | Injury from Burn | open |
| 5/24/2011 | 10A28914 | Nationwide Claim 77 10 PE 031202 052411 51 | Injury from Burn | open |
| 6/3/2011 | 10A28915 | Nationwide Claim 77 10 PE 01203 060311 51 | Injury from Burn | open |
| 5/28/2011 | 10A28928 | Nationwide Claim 77 10 PE 031216 052811 51 | Injury from Burn | open |
| 6/3/2011 | 10A28929 | Nationwide Claim 77 10 PE 031217 060311 51 | Injury from Burn | open |
| 6/10/2011 | 10A28930 | Nationwide Claim 77 10 PE 031219 061011 51 | Injury from Burn | open |

| | | | | |
|---|---|---|---|---|
| 6/3/2011 | 10A28931 | Nationwide Claim 77 10 PE 031220 060311 51 | Injury from Burn | open |
| 5/28/2011 | 10A28932 | Nationwide Claim 77 10 PE 031222 052811 51 | Injury from Burn | open |
| 3/31/2011 | 10A28933 | Nationwide Claim 77 10 PE 031224 033111 51 | Injury from Burn | open |
| 2/29/2011 | 10A28945 | Nationwide Claim 77 10 PE 031245 021911 51 | Injury from Burn | Open |
| 6/8/2010 | 10A22678 | Nationwide Claim 77 10 PE 022983 060810 51 | Damage to other vehicle by company driven truck | closed |
| 5/24/2011 | 10A28902 | Nationwide Claim 77 10 PE 031188 052411 51 | Injury from Burn | Open |
| 5/9/2008 | 10A10364 | Nationwide Claim 77 10 PE 008364 050908 51 | Damage to Property | Closed |
| 2/3/2008 | A8C2936 | Travelers | Claimant fell | Closed |

In addition, Seller is aware of the following potential personal injury and/or property claimants related to Excluded Inventory, which Seller is in the process of organizing for submission to its insurer:

- Michael Hubbard, Long Island, New York;
- Jonathan Mitzman, Manhattan, New York;
- Nick Stone, Manhattan, New York;
- Sandi Grove, Granger, Indiana;
- Robert McCutcheon as well as his wife Kimberley, his daughter Holly, and his sister-in-law Jamie Perez, Omaha, Nebraska;
- Becky Hart, Huntingtown, Maryland;
- Lauren Levitt, Encino, California;
- Skyler Kelley, Carlstadt, New Jersey;
- William Anderson, Baltimore, Maryland;
- An incident reported by Flowers 'N Such;
- An incident reported by Lammers Glass Gifts & Antiques;
- An incident reported by My Favorite Things regarding a customer;
- An incident reported by Pasquesi Home & Garden regarding a customer;
- An incident reported by Kellie Burke Designs, LLC;
- Bianca Gonzales;
- Anne from Sealy, Texas reporting injuries to her Aunt;

- The daughter of Cynthia Greene McNutt, Nashville, Tennessee;
- Ronald B. Boney and Ann B. Boney, Florida;
- A customer of Brace Books & More in Ponca City, Oklahoma;
- Dr. Brian Russell;
- CPSC report regarding a fire in Fishers, Indiana (consumer names withheld);
- Daryl Hersch, Spokane, Washington;
- bertandcarl30@aol.com;
- Neighbor of Colleen Welsch, reported to Indiana Backyards;
- Connecticut resident (name unknown), as reported by Richard Maloney, Director of Trade Practices with the Connecticut Department of Consumer Protection and Robert Nakano, Supervising Special Investigator with the Trade Practices Division of the Connecticut Department of Consumer Protection;
- Consumer incidents in Minnesota, as reported by Joy Nakrin of Minneapolis/St. Paul station KSTP;
- John Price, Dallas, Texas;
- Steve Dani and a friend; Ann Arbor, Michigan;
- Patrick Murphy;
- Client of T. David Hoyle, an attorney. Mr. Hoyle's letter also references two additional incidents in South Carolina;
- Rachael Smilowitz, West Ashley, South Carolina;
- The daughter of Matt Gregory, Carthage, Mississippi;
- Brent and Tracey Miller, Kissimmee, Florida
- Kathy Mundth, Reedsburg, Wisconsin;
- Scott Colquhoun, Wilmington, North Carolina;
- Gregory Kriss, Burlington, Connecticut;
- Jacqueline Ortiz-Delgado and Renee Delgado, Florida;
- Robinson Ginsburg, New York, New York;
- Carla Smith;
- Randolph Stevens and Julie Stevens, as a result of alleged injuries to Rebecca Hart;
- Pat Cocke;
- Jack Butler Norman, III v. Napa Home & Garden, Inc., et. al., Superior Court of New Jersey, Essex County, Docket No: ESX-L-4937-11;
- David and Debra Gwerder, as a result of alleged injuries involving John Cowan;
- William Biggins, Maryland;
- Francesco A. Pollari, New York;
- Kate McDevitt and Alexander Getz;
- Jeannine Noe, Cheyenne, Wyoming;
- The son of Nancy Reyer;
- Rachael Smilowitz v. Napa Home & Garden Inc. et al., No. 11-CP-4202 (Ct. of Common Pleas, Ninth Jud. Cir.); and
- Satterfield et al. v. Napa Home & Garden Inc., et al., No. 7:11-cv-01514-JMC (D.S.C.).
- An incident reported by City People's Garden regarding a customer
- An incident reported by Hyams Landscape & Garden Center
- An incident reported by Avondale Gift Boutique regarding a customer

- To the extent not included above, Seller also incorporates the lawsuits identified in Schedule 4.16.

4.10(c)

Notice of Cancellation of Insurance: Package Including Auto: Policy Number: ACP 7123714050 BPWC BAA CAA  BPW; mailed to Seller June 27, 2011.

Schedule 4.11

Customers

(a)

| Top Ten Customers 2010 | | |
|---|---|---|
| CUSTOMER NAME | FISCAL YEAR | SALES TOTAL |
| DILLARD'S | 2010 | 671,800.00 |
| RESTORATION HARDWARE | 2010 | 610,717.99 |
| BURRIS LOGISTICS | 2010 | 196,237.94 |
| W.R. VANDERSCHOOT OF VA, INC | 2010 | 192,727.16 |
| BED BATH & BEYOND | 2010 | 183,805.50 |
| DESIGN HOME | 2010 | 124,085.24 |
| BALLARD DESIGNS | 2010 | 116,262.80 |
| MEIJER, INC | 2010 | 98,870.16 |
| BRASS EXCHANGE, THE | 2010 | 76,695.20 |
| FLOWER MART BY SUNRISE | 2010 | 55,350.19 |
| | | **2,326,552.18** |

| | CUSTOMER NAME | **Jan-11** | **Feb-11** | **Mar-11** | **Q1 TOTAL** |
|---|---|---|---|---|---|
| 1 | BED BATH & BEYOND DIRECT TO STORE | $ 860.80 | $ 862.80 | $ 376,895.51 | $ 378,619.11 |
| 2 | SHOPKO | $ 144,994.80 | $ 77,058.00 | $ 32,576.00 | $ 254,628.80 |
| 3 | BED BATH & BEYOND DIRECT IMPORT | $ 228,294.30 | $ - | $ - | $ 228,294.30 |
| 4 | DILLARD'S | $ 103,578.00 | $ 43,890.00 | $ - | $ 147,468.00 |
| 5 | MEIJER, INC | $ - | $ 32,000.00 | $ 58,991.64 | $ 90,991.64 |
| 6 | DESIGN HOME | $ 5,073.48 | $ 5,462.05 | $ 49,183.85 | $ 59,719.38 |
| 7 | BALLARD DESIGNS | $ 17,446.10 | $ - | $ 22,320.00 | $ 39,766.10 |
| 8 | NEIMAN MARCUS | $ 11,085.00 | $ 7,097.50 | $ 14,000.00 | $ 32,182.50 |

16

| | DIRECT | | | | |
|---|---|---|---|---|---|
| 9 | MIDA HOLDINGS | $ 1,121.70 | $ 13,782.55 | $ 16,600.75 | $ 31,505.00 |
| 10 | RESTORATION HARDWARE | $ 5,214.50 | $ 6,335.25 | $ 12,776.00 | $ 24,325.75 |

(b)

- Design Home, the Canadian distributor, has been cancelled.
- Although many key customers purchased firelites and fuel and will cancel or terminate their purchase orders for those products and may decide not to do further business with Seller, the Seller has not received notice of any Key Customers that intend to cancel or terminate their relationship.

Schedule 4.12

Affiliate Transactions
**None**

Schedule 4.13

Contracts

(a)

| CONTRACT NAME | TYPE | DESCRIPTION |
|---|---|---|
| American Honda | Lease | Honda Pilot |
| Atlanta Showroom | Lease | Atlanta Showroom |
| Betty Sewell | Agreement | License Agreement |
| BlueWave | Agreement | IT Support |
| Bruce Larson | Agreement | Sales Rep Agreement |
| Casual Furniture Show | Agreement | Exhibitor Contract for September 2011 |

| | | |
|---|---|---|
| Catapult Consulting | Agreement | Product Development Agreement |
| Cbeyond | Agreement | Phone line provider |
| Cintas | Agreement | Janitorial/Hygiene Products purchased |
| Cobalt Industrial | Lease | Duluth Office/Warehouse |
| Evergreen | Agreement | Inventory Container Shipment |
| Fuel Barons | Agreement | License Agreement |
| Guy Wolff | Agreement | License Agreement |
| HomeStyle/Ivystone Group | Agreement | Sales Rep Agreement |
| HomeStyle Atlanta & Dallas | Agreement | Showroom Shared Space Rental |
| Idealease | Lease | Delivery Truck |
| IHFC Properties | Lease | High Point Showroom |
| Independent Garden Ctr Show | Agreement | Exhibitor Contract for August 2011 |
| Industry Connection | Agreement | Annual Website Hosting |
| Leaf Financial | Purchase | Display Booth |
| More Turns | Agreement | Sales Rep Agreement |
| My Domain | Agreement | Domain agreement |
| Paulson Cheek | Agreement | HVAC Maintenance |
| Peter Jackson | Agreement | Sales Rep Agreement |

| Pitney Bowes | Agreement | Postage Machine Rental |
|---|---|---|
| Ron Sheldrick | Agreement | Sales Rep Agreement |
| Rosenberg | Agreement | Sales Rep Agreement |
| Storage One | Agreement | LV inventory storage |
| Tecsys | Agreement | Winsol Support & License |
| Tracey Dunsire | Agreement | Sales Rep Agreement |
| Tavolacci | Agreement | Purchase Agreement |
| Vertical Response | Agreement | Monthly support for e-mail blast |
| Woodbridge Group LLC | Broker Agreement | |
| Wells Fargo | Lease Purchase | Konica Copier |
| WMCV | Lease | Las Vegas Showroom |
| Xerox | Agreement | Supply Maintenance Agreement |

(b)  Design Home, the Canadian distributor, has been cancelled.


Schedule 4.14


Taxes
**All tax filings are current.  No taxes due.**

<u>Schedule 4.16</u>

Litigation

All the following Litigation, except #3 listed below are related to Excluded Inventory:

1. Donal Rudolph and Joan Rudolph v. Napa Home & Garden, Inc., Losorea Packaging, Inc. and the Dees' Nursery & Florist, Inc.; Civil Action File No. 000884-11, Supreme Court of New York; Nassau County
2. Jack Butler Norman, III v. Napa Home & Garden, Inc., Lasorea Packaging, Inc., Fuel Barons, Inc., Michael Deak, Patrick Butler, ABC Company 1-5, fictitious names, John Does 1-5, fictitious names; Civil Action File No. L-4937-11, Superior Court of New Jersey, Law Division: Essex County
3. Napa Home & Garden, Inc. v. Joe Colvin d/b/a Colvin Hastings Design, Superior Court of Gwinnett Count State of Georgia (related to a claim brought against an artist as a result of a commission dispute)
4. U.S. Consumer Product Safety Commission recall of Seller's and Bed Bath & Beyond gel fuel products
5. Health Canada recall of Seller's gel fuel products
6. Review of Seller's gel fuel products by State of Connecticut Department of Consumer Protection
7. Review of Seller's gel fuel products and distribution by State of Illinois Office of Attorney General
8. Additionally, Seller incorporates all potential claims and claimants identified in Schedule 4.10(b).

Exhibit "B"

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

-------------------------------------------------------------x

In re:                                        :        **Chapter 11**

                                              :

**NAPA HOME AND GARDEN, INC.,**               :        **Case No. 11-____ (___)**

                                              :

           Debtor.                            :        **Dkt. Ref.:**

-------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365 (I) ESTABLISHING
AUCTION AND BIDDING PROCEDURES FOR THE SALE OF CERTAIN ASSETS
OUT OF THE ORDINARY COURSE OF BUSINESS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS; (II) APPROVING PAYMENT OF
A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (III) SCHEDULING A
FINAL HEARING AUTHORIZING THE SALE TO THE HIGHEST AND BEST
BIDDER(S); AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "**Sale Motion**")[1] of Napa Home and Garden, Inc. as debtor

and debtor-in-possession (the "**Debtor**") pursuant to sections 105(a), 363, and 365 of the

Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006 and 9014, for, *inter alia*, the entry of

this Procedures Order (i) establishing the Auction and Bidding Procedures for the Sale, on an "as

is, where is" basis, of the Acquired Assets, (ii) approving the payment of a Breakup Fee and

Expense Reimbursement to Teters, and (iii) scheduling the Sale Hearing to consider the Sale of

the Acquired Assets to the Winning Bidder; and a hearing having been held before the Court on

July [__], 2011 to consider approval of the Sale Motion to the extent set forth therein; and the

Court having determined that the relief requested in the Sale Motion is in the best interests of the

Debtor, its estate, creditors and other parties-in-interest; and due and adequate notice of the Sale

Motion having been given under the circumstances; and upon the entire record in these Chapter

11 Cases; and after due deliberation thereon, and good and sufficient cause appearing therefor, it

is hereby

---

[1]  Capitalized terms not defined herein shall have the meanings provided to them in the Motion.

**FOUND AND DETERMINED THAT**:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case and the Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.    The statutory predicates for the relief sought in the Sale Motion are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014.

D.    Due and adequate notice of the Sale Motion, the proposed Sale, the Auction and Bidding Procedures and the Auction, the Procedures Hearing, and the subject matter thereof has been provided, or will be provided, to all parties-in-interest, and no other or further notice is necessary.  A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested parties.

E.    Time is of the essence in proceeding with the Proposed Sale Process in accordance with the Auction and Bidding Procedures.  The Debtor and the estate will suffer substantial harm if the Auction and Sale is delayed.   Based upon the exigent facts and circumstances of the case, good cause exists for the Sale to proceed on an expedited basis.

F.    The relief requested in the Sale Motion is in the best interests of the Debtor, its estate, creditors and other parties-in-interest.  The Debtor has demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Sale Motion.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Sale Motion is granted to the extent set forth herein.

2.      All objections to the relief provided herein that have not been withdrawn, waived or settled, are hereby overruled and denied on the merits.

3.      The Auction and Bidding Procedures set forth on <u>Exhibit A</u> hereto are hereby approved.

4.      The Debtor is authorized to pay to Teters the Breakup Fee and Expense Reimbursement as a super-priority administrative expense under section 364(c) of the Bankruptcy Code, senior to all other administrative expense claims except, with respect to the Breakup Fee only, any administrative expense claim on account of any fees of Jones & Walden, LLC.

5.      The Debtor is further authorized to take such steps and incur such expenses as may be reasonably necessary or appropriate to effectuate the terms of this Procedures Order.

6.      A Sale Hearing to consider the Sale of the Acquired Assets free and clear of liens, claims, encumbrances and interests to the Winning Bidder (pursuant to the terms of the asset purchase agreement with such Winning Bidder) shall be held before this Court on [_____], 2011 at [_____] (Prevailing Eastern Time) at the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division.

7.      The Court shall retain exclusive jurisdiction to resolve any dispute arising from or relating to the Sale or this Procedures Order.

Dated: [_____], Georgia
                    _____, 2011

                                          _____
                                          Honorable [_____]
                                          United States Bankruptcy Judge

Exhibit "A" to Order

## Auction and Bidding Procedures

The Debtor intends to conduct an auction (the "**Auction**"), which shall be governed by the following Auction and Bidding Procedures:[2]

Bid Deadline:      The "**Bid Deadline**" shall be July [__], 2011 at 4:00 p.m. (EDT).

Only bidders who timely submit Qualified Bids (as defined below) by the Bid Deadline will be considered.

Qualified Bid:      The Debtor will require any interested bidder to submit to a bid that meets the following requirements (such bid, a "**Qualified Bid**," and such bidder, a "**Qualified Bidder**"): (i) state that the Qualified Bidder offers to consummate the Sale pursuant to an agreement that has been marked to show amendments and modifications to the Agreement, including price and terms (the "**Marked Purchase Agreement**"); (ii) confirm that the offer shall remain open and irrevocable until the closing of a Sale to the Winning Bidder or the Next Highest Bidder (as defined herein); (iii) enclose a copy of the proposed Marked Purchase Agreement that provides for cash consideration to the Debtor that is at least $160,000 greater than the cash consideration plus the Assumed Obligations to be paid by Teters (the "**Initial Overbid**"); (iv) the Marked Purchase Agreement must specifically identify the Acquired Assets proposed to be purchased, and the Contracts to be assumed and assigned; (v) be accompanied by a certified or bank check or wire transfer in an amount equal to 10% of the purchase price identified in the Marked Purchase Agreement, as a minimum good faith deposit (the "**Minimum Deposit**"), which Minimum Deposit shall be used to fund a portion of the purchase price provided for in the bid; (vi) be on terms that are not materially more burdensome or conditional than the terms of the Agreement; (vii) not be conditioned on obtaining financing or the outcome of any due diligence by such Qualified Bidder; (viii) not request or entitle the Qualified Bidder to any break-up fee, expense reimbursement or similar type of payment; and (ix) fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, including any affiliation with the Debtor and or its officers and directors.

The Debtor agrees to provide the prepetition secured lender and any official committee of unsecured creditors (the "**Committee**") with a copy of the Marked Purchase Agreement supporting each Qualified Bid, if any, and such other information regarding each Qualified Bid as the prepetition secured lender or the Committee may reasonably request from time to time.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion or Agreement, as applicable.

Each Qualified Bidder shall be deemed to acknowledge: (i) that it had an opportunity to conduct the necessary and appropriate due diligence review of all pertinent documents with respect to the Acquired Assets and Assumed Contracts before making its offer, and that such Qualified Bidder relied solely on that review and upon its own investigation in making its offer, and (ii) that such Qualified Bidder is not relying upon any written or oral statements, representations, or warranties of the Debtor, its agents or representatives.

Minimum Deposit:

The Debtor shall hold in escrow (without interest) the Minimum Deposit of the Winning Purchaser and the Minimum Deposit of the Next Highest Bidder (defined below) until the earlier of: (A) the Closing of the Sale, and (B) seven (7) Business Days after the Auction.  The Debtor shall return the Minimum Deposits of all other Qualified Bidders within three (3) business days after the Auction.

Auction:

If the Debtor receives more than one Qualified Bid for the Acquired Assets, the Auction will take place at the office of Jones & Walden, LLC, 21 Eighth St., NE, Atlanta, GA 30309 on July [__], 2011 at [10:00] a.m. EDT, or such later time and place as the Debtor may provide so long as such change is communicated reasonably in advance by the Debtor to all bidders, and other invitees.

Auction Rules:

If an Auction is held, the following rules for its conduct will be observed: (i) only a Qualified Bidder who has submitted a Qualified Bid by the Bid Deadline will be eligible to participate at the Auction; (ii) a minimum Qualified Bid amount for the Acquired Assets may be announced and/or posted prior to the Auction, which minimum Qualified Bid amounts may be established based upon a variety of factors, including, without limitation, the highest bids received prior to the Auction; (iii) at the Auction, Qualified Bidders will be permitted to increase their bids in minimum increments of $50,000 (the "**Bidding Increment**"), and bidding at the Auction will continue until such time as the highest or otherwise best offer is determined in accordance with these Auction and Bidding Procedures or until such Auction is adjourned by the Debtor (and reasonable notice of the time and place for the continuance of the Auction will be given to all Qualified Bidders, counsel to the Committee, counsel to the Debtor's prepetition secured lender; (iv) immediately prior to concluding the Auction, the Debtor shall (a) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the Sale and the best interests of the Debtor's estate and creditors; (b) in consultation with the prepetition secured lender and the Committee, (1) determine and identify the highest or otherwise best Qualified Bid (the "**Winning Bid**") and the winning bidder submitting such bid (the "**Winning Purchaser**") and (2) determine and identify the second highest or best Qualified Bid after the Winning Bid (the "**Next Highest Bid**") and the bidder submitting such bid (the "**Next**

**Highest Bidder**"); and (c) have the right to reject any and all bids; (viii) the Winning Purchaser shall complete and execute all agreements, instruments, or other documents evidencing and containing the terms and conditions upon which the Winning Bid was made prior to the Sale Hearing.

| | |
|---|---|
| Selection and Notice of <u>Winning Bid</u>: | If an Auction is held, the Debtor shall be deemed to have selected the Winning Bid only where (i) such bid is declared the Winning Bid at the Auction, and (ii) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Winning Bid and the entry of an order approving the Sale to the Winning Bidder.  Following the selection of the Winning Bid, the Debtor shall promptly notify the Bankruptcy Court and parties-in-interest of the identity of the Winning Bidder, the amount of the Winning Bid, and shall include a substantially final version of the asset purchase agreement executed with the Winning Bidder. |
| Reservation <u>of Rights</u>: | The Debtor reserves the right as it may reasonably determine to:  (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal <u>provided</u> <u>that</u> such determination shall be made in consultation with the prepetition secured lender and the Committee; (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Auction and Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtor and its estate; (v) remove some or all of the Acquired Assets, Contracts or Real Property Leases from the Auction, (vi) impose additional terms and conditions with respect to potential bidders, (ix) extend the deadlines set forth herein, (x) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (xi) modify these Auction and Bidding Procedures (including the Initial Overbid and Bidding Increment) as they may determine to be in the best interest of the estate. |

Exhibit "C"

Taxing Authorities

Internal Revenue Service
401 W. Peachtree Street, N.W.,
Suite 640,
Atlanta, GA, 30308

Georgia Department of Revenue:
P.O. Box 105408
Atlanta, GA 30348

State of California
Franchise Tax Board
300 S. Spring Street, Suite 5704
Los Angeles, CA 90013-1265

Washington State Department of Revenue
c/o Rob McCenna, Attorney General State of Washington
1125 Washington St SE
Po Box 40100
 Olympia, WA 98504

Gwinnett County Tax Commissioner
Richard Steele, Tax Commissioner
75 Langley Drive
Lawrenceville, GA 30046

City of Duluth, Georgia
3167 Main Street
Duluth, GA 30096

Exhibit "D"

**<u>Cornerstone Bank</u>**
Charles K. Yorke, President
Cornerstone Bank
2060 Mt. Paran Road NW, Suite 100
Atlanta, Georgia 30327

**<u>Leaf Financial Corporation</u>**
Miles Herman, President
Leaf Financial Corporation
One Commerce Square
2005 Market Street
15th Floor
Philadelphia, PA 19103

Exhibit "E"

Cure Amounts

None[1]

---

[1] Debtor reserves the right to amend this Exhibit "E."